**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 98-41056
_____

LOMA CARROLL and JESUS SOLIZ, JR.,

                        Plaintiffs-Appellees-Cross-Appellants,

versus

HOECHST CELENESE CORP.,

                        Defendant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas
(97-CV-349)
_____

December 17, 1999

Before REYNALDO G. GARZA, JOLLY, and WIENER, Circuit Judges:

WIENER, Circuit Judge:[*]

In this case arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), with pendant state law claims, Plaintiff-Appellee-Cross-Appellant Loma Carroll ("Carroll") challenges the jury verdict finding that Defendant-Appellant-Cross-Appellee Hoechst Celenese Corporation ("HCC") violated Title VII but that Carroll did not prove individual damages resulting from the violation. HCC, in its appeal,

_____

[*] Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

challenges the jury verdict finding it liable for intentional infliction of emotional distress under Texas law and awarding Carroll $250,000 in compensatory and punitive damages. HCC also challenges the jury finding that it violated Title VII. We affirm in part and reverse in part.

## I.

### Facts and Proceedings

Carroll worked for HCC in its Bishop, Texas chemical plant as an operator in the Methanol Oxidation unit (the "MO"). Her employment with HCC began on May 24, 1993. The MO operated on a 24-hour basis with two rotating 12-hour shifts. There was no permanent supervisor over the shifts which instead ran as "self-directed" work teams, with the senior operators rotating as "lead operator" for a shift. The lead operator handled supervisory duties such as hearing employee complaints, giving and enforcing work assignments, and reassigning operators. The operators reported to Rick Villarreal ("Villarreal"), Operations Specialist, who worked a "straight days" schedule. Ronnie Hilbrich ("Hilbrich") was the supervisor in charge of the larger area of the HCC plant that included the MO unit.

HCC terminated Carroll's employment on September 17, 1996, after an investigation revealed that she had falsified chemical tank readings. At that time, she was being considered for a promotion to the highest operator position in the MO. In the September 7, 1996 performance review relevant to her possible

2

promotion, Carroll received positive comments from her supervisors. In her own statement of interest in the promotion, she spoke highly of HCC and her experience there, indicating that she was "acutely aware of the integrity" of HCC, that she knew she could "count on" her supervisor, "Jesse Solis [sic]" and on "my fellow operators to help me when the need arises." She also stated that she felt she had "found a home in the MO unit." Ten days after she was fired, Carroll filed an employment discrimination claim with the state Human Relations Commission and with the EEOC, alleging that HCC violated Title VII by firing her not for falsification of records but rather in retaliation for complaining about perceived sexual harassment.

On June 30, 1997, more than nine months after those filings, Carroll and Plaintiff Jesus Soliz, Jr. filed the instant lawsuit against their former employer, HCC, alleging that they were terminated in retaliation for protected opposition conduct, in violation of Section 704(a) of Title VII. Specifically, they alleged that they opposed what they perceived as sexual harassment of Carroll. Carroll and Soliz also asserted claims for intentional infliction of emotional distress under Texas law, and Carroll asserted a separate claim under Title VII for hostile work environment sexual harassment. On April 1, 1998 Carroll amended her intentional infliction of emotional distress claim — originally based (like Soliz's claim) on defamation in the form of workplace rumors regarding sexual misconduct — to allege distress

3

stemming from the harassment and retaliation itself.

HCC moved for summary judgment on Soliz's retaliation and intentional infliction claims, on the allegedly time-barred portions of Carroll's hostile work environment claims, and on Carroll's intentional infliction claim. The district court granted the motion in respect to Soliz's intentional infliction claim.

The remainder of the claims were tried to a jury. It returned a verdict finding that (1) Soliz had opposed what he reasonably believed to be sexual harassment, (2) Carroll had been subjected to a sexually hostile work environment, (3) neither Carroll nor Soliz had been fired in retaliation for opposing sexual harassment, (4) Carroll suffered no damages as a result of the sexual harassment, (5) one or more employees of HCC intentionally inflicted emotional distress on Carroll, (6) the conduct was ratified by one of HCC's managers, and (7) Carroll should be compensated $50,000 for severe emotional distress and related injuries, and should receive $200,000 in punitive damages for HCC's malicious and willful conduct.

Following the verdict, HCC moved for judgment as a matter of law, arguing that the jury erred in finding that HCC created a sexually hostile environment in violation of Title VII and in awarding damages for intentional infliction of emotional distress. The district court denied the motion, holding that a reasonable juror, hearing all the evidence presented, could find that (1) the conduct complained of was extreme and outrageous, and (2) Carroll

4

suffered severe emotional distress.

Carroll moved for a new trial on the issue of damages for the Title VII violation, arguing that the jury's verdict awarding no damages after finding that Carroll was subjected to a sexually hostile work environment was inconsistent with the award of $250,000 damages for intentional infliction of emotional distress. The district court denied the motion, explaining that there was "at least one logical interpretation of the jury's award: it believed that the injury suffered by Carroll was the result of acts which constituted intentional infliction of emotional distress yet which did not constitute sexual harassment."

Carroll presented evidence of various incidents in support of her claims that she was subjected to a sexually hostile work environment and that she suffered severe emotional distress. Carroll was assigned to the MO unit soon after she began her employment with HCC and she was the only woman in the unit. Carroll testified about various incidents that occurred during her training on the unit. For example, an operator told her, "you won't be here long, women don't last long here in the MO units." Another operator made hostile and obscene comments about women that made Carroll feel uncomfortable. Carroll's trainer, Oscar Lopez, on one occasion blocked her way as she was exiting a room, grabbed her, and tried to kiss her. At a unit party, another co-worker rubbed his hands and legs against Carroll's legs underneath a picnic table and made unwelcome sexual advances.

Carroll testified that an hourly operator on another shift, Ramon Perez, had been flirtatious and had casually touched her from the time she started work on the MO; on one particular occasion in 1994, he grabbed her from behind, placing his hands on her breasts, pressing his groin into her buttocks, and leaning around to kiss her on the face and neck. Carroll reported the incident to Villarreal and Hilbrich who told her they would "take care of it." Following that incident, Perez began making disparaging comments to Carroll about her work performance and on occasion "accidentally" rubbed against her, touching her breasts. Carroll and Perez rarely worked on the same shift, therefore, the encounters were relatively infrequent.

Carroll also testified that a supervisor, Henry Aleman, when shaking her hand, would "have this really soft grip and he would just massage my hand and then he would take his other hand and run his hand up to my elbow and then up my arm and start rubbing the side of my breasts." She also testified that he would come up behind her, rub her shoulders, and try to run his hands down her chest.

Carroll also presented evidence of a sexual harassment complaint brought in 1994 by Teresa Dixon, an employee in the paraform unit, against Aleman and other employees in her unit. Carroll was interviewed in connection with that complaint, and she discussed her knowledge of continuing problems with sexual harassment by several individuals. Dixon told the employees in

6

HCC's human resources unit, to whom she reported the allegations of harassment, that some employees told her that Carroll "was going to be next." The offenders identified in the Dixon investigation were not terminated but were placed on one-year probation.

Carroll testified that following her cooperation in Dixon's complaint, the attitudes and behavior of the men on the MO unit shifted from flirtation and sexual innuendo to hostility. Specifically, Carroll described statements by Dale Kennemer and Larry Pena, each of whom, as lead operators on shifts, had supervisory authority over her, that if any woman in the MO complained of sexual harassment, they would know how to get rid of her. They also told her that they knew how to get the "date rape drug" and could administer it without anyone knowing, and then they could do anything they wanted to her.

Carroll described various other incidents, such as a bald co-worker asking her in the presence of a bald shift supervisor if she had "ever had sex with a bald man"; a co-worker consistently referring to her as "sweetheart, honey, or baby" rather than by her name; and incidents in the unisex bathroom including a stall "plastered with feminine napkins" and obscene graffiti.

In addition to evidence of incidents at work or directly attributable to HCC employees, Carroll also testified about incidents for which she could not establish a definitive connection to HCC, but she contends that a reasonable juror could infer that HCC or its employees were responsible for those incidents. For

7

example, Carroll testified that between 1994 and 1995 she received obscene phone calls at home and at work. Carroll's daughter received one of the calls at home which made reference to the MO. The calls Carroll received at work could be identified by the distinctive ring as coming from another extension in the plant. HCC investigated the calls but could not identify any person or persons responsible for making them. Carroll also reported to her supervisors that she received anonymous, sexually suggestive pages (such as a repeated string of "69s") on the pager issued to her by HCC. Again, an investigation by HCC did not result in identification of the offender or offenders.

Carroll also testified that she had received three anonymous gifts at her home. The first was a bouquet of flowers on Valentine's Day 1994, with an unsigned card praising her work in the MO. A second bouquet of flowers arrived in November 1994, with the same anonymous message. Finally, on December 25, 1995, Carroll received a "nightie" and a "basket of perfume" with an anonymous card reading, "Watch out when you're at MO3." Carroll testified that she did not report the incidents to HCC until after receiving the third gift. The sender was never identified.

In February or March 1996, Carroll's keys were stolen out of her unlocked car in the HCC parking lot. Carroll reported the incident to Villarreal but not to police or plant security. A few weeks after that theft, Carroll's home was burglarized and electronic equipment was stolen. Carroll presented no evidence

linking the incidents to each other or to anyone at HCC.

In June 1996, Carroll found what appeared to be feces on the hood of a unit pickup truck that she drove on occasion. The truck normally would be driven by the lead operator on the shift, who that night was Kennemer, but the truck was available to all operators on the shift. The night of the incident, Kennemer had driven the truck just before Carroll, and she conceded that the prank was not necessarily directed at her. Carroll reported this incident to Villarreal, but the perpetrator was never identified.

On August 19, 1996 Carroll discovered a "mobile" in her employee locker consisting of condoms, birth control suppositories, small tubes of Vaseline or K-Y Jelly, and an assortment of motel keys. Carroll reported the incident to Hilbrich who conducted an investigation with a representative of the Human Resources department. They questioned every employee in Carroll's unit and reiterated to each employee the company's policy against sexual harassment —— including the fact that such conduct could lead to termination. The investigation was unsuccessful in identifying the person or persons who had put the items in Carroll's locker.

II.

Standards of Review

At the close of all the evidence and again after entry of the verdict, HCC moved for judgment as a matter of law on the following

issues: (1) that Soliz opposed what he reasonably believed to be a sexually hostile work environment, (2) that Carroll was subjected to a sexually hostile work environment, and (3) that she suffered intentional infliction of emotional distress. The district court denied the motions. We will not reverse the court's denial of a motion for judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in favor of one party that a reasonable jury could not have concluded otherwise.[1]

Carroll too sought post-judgment relief, moving for a new trial on the issue of the absence of damages awarded for the Title VII violation. As the court denied the motion, we review the denial of damages not for "clear error"[2] but for abuse of discretion. If a "jury award is reviewed indirectly through the conduit of the trial court's response to a motion for a new trial on the issue of damages, it is the propriety of the judge's action rather than the jury's decision that is reviewed. Thus, the abuse of discretion standard applies."[3]

## III.

## Limitations Periods

Carroll can recover under Title VII only for sexual harassment

---

[1] Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc).

[2] Gautreaux v. Scurlock Marine, Inc., 84 F.3d 776, 782 (5th Cir. 1996).

[3] Id.

10

that occurred during the 300 days before she filed her Charge of Discrimination with the EEOC.[4] The district court properly charged the jury on the limitations period. Carroll was fired on September 17, 1996 and filed a charge with the state agency and the EEOC on September 27, 1996. December 1, 1995, was the 300th day before September 27, 1996; thus, only conduct that occurred on or after December 1, 1995, can be the basis of recovery for damages caused by the sexually hostile work environment.

In considering Carroll's claim for intentional infliction of emotional distress under Texas law, we note that Carroll can recover only for conduct that occurred during the two years prior to the filing of her complaint, as Texas has a two-year statute of limitations for personal injury actions.[5] Carroll filed her original complaint on December 30, 1997, seeking recovery for, among other causes, intentional infliction of emotional distress on the basis of allegedly defamatory statements. On April 1, 1998, the district court granted Carroll leave to amend her complaint to change the factual basis for the intentional infliction claim, to allege damages from the harassment and retaliation itself rather than from defamation. The court treated the date of that order as the filing date of Carroll's Third Amended Complaint. Accordingly, we consider the claim filed on April 1, 1998 and allow Carroll to

---

[4] See 42 U.S.C. § 2000e-5(e); Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394-95 (1982).

[5] Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).

recover, if at all, only for conduct occurring on or after April 1, 1996.  HCC properly raised the affirmative defense of the statute of limitations in both its original and amended answers; the defense was not waived.

Having stated these applicable limitations periods on Carroll's theories of recovery, we emphasize that —— as the district court properly instructed the jury —— evidence concerning time-barred activity is nevertheless relevant and may be used to illuminate the current practice at issue.[6]  The jury could not, however, impose liability for any sexual harassment that occurred prior to December 1, 1995 or for conduct prior to April 1, 1995 causing intentional infliction of emotional distress.

IV.

Title VII - Sexually Hostile Work Environment

Carroll presented sufficient evidence on which a reasonable jury could find that she was subjected to a sexually hostile work environment in violation of Title VII.  Nevertheless, the district court did not err in declining to grant a new trial on the issue of damages even though the jury awarded no damages to Carroll for the Title VII violation.

To prevail on a Title VII claim of hostile work environment sexual harassment, the plaintiff must prove that:  (1) she belongs

---

[6] Cortes v. Maxus Exploration Co., 977 F.2d 195, 200 (5th Cir. 1992) (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)); Soto v. El Paso Natural Gas Co., 942 S.W.2d 671, 677 (Tex. App. 1997).

12

to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was because of sex; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[7]

Applying each of these elements, we conclude: (1) Carroll, as a woman, is member of a protected group; (2) she did not consent to, encourage, or welcome the sexual comments or other actions towards her; and (3) at least some of the harassment was because of her sex. The Supreme Court, in Oncale v. Sundowner Offshore Services, Inc.,[8] clarified that Title VII's proscription against discrimination "because of . . . sex" does not refer to behavior motivated solely by sexual desire but strikes at situations in which members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not.[9] A reasonable juror could find that Carroll, especially as the sole female employee on the MO, was subjected to working conditions that the male employees were not, even if not all of the conduct or comments were motivated by sexual desire.

As to element (4), a reasonable jury could find that the harassment altered the terms or conditions of Carroll's employment.

---

[7] Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir. 1986).

[8] 118 S. Ct. 998 (1998).

[9] Id. at 1002.

13

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently sever or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."[10] Whether the harassment was sufficiently "severe or pervasive"[11] to alter the conditions of employment and create an abusive working environment is a question to be determined with regard to the "totality of the circumstances."[12] As discussed above, the jury could not find Title VII liability on the basis of events or incidents outside the 300-day period prior to Carroll's filing her complaint with the EEOC, but the jury could consider evidence of more remote incidents to inform its findings about the totality of the circumstances.

Events definitely occurring within the relevant 300-day period, after December 1, 1995, include (in reverse chronological order):[13] (1) the locker incident on August 19, 1996, (2) the truck incident in June 1996, (3) & (4) the theft of car keys and

---

[10] Id. at 1001 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

[11] Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

[12] Jones, 793 F.2d at 720.

[13] We recognize that some of the incidents are difficult to attribute to HCC or to the workplace at all, e.g., the residential burglary, and that other incidents were committed by an unidentified perpetrator and at most suggest some nexus to the workplace, e.g., the gift cards referring to the MO. The record nevertheless provides a sufficient basis (albeit barely) on which to find a hostile workplace, and as we are affirming the judgment of the district court, we need not further refine each factual determination.

14

residential burglary both in February or March of 1996, (5) the delivery of a gift basket and nightgown to Carroll's home on December 25, 1995, and (6) at least some incidents of "accidental" rubbing or touching by Perez.  Other ongoing conduct, such as comments or use of "terms of endearment" rather than Carroll's proper name by co-workers, as well as obscene phone calls and pages also may have occurred during the relevant time period.[14]  On the basis of the evidence presented, a reasonably jury could find that Carroll was subjected to harassment that was sufficiently severe or pervasive to alter the terms and conditions of work.

Finally, on element (5), a reasonable jury could find -- although this is a closer question -- that HCC either knew or should have known of the harassment and failed to take prompt remedial action.  Carroll on several occasions complained to her supervisors (and, at least with regard to the locker incident, to human resource personnel) about the harassment and specifically complained about each of the incidents listed above that occurred within the limitations period.  Therefore, HCC clearly had notice of the harassment.  In response to each of the listed incidents, HCC conducted an investigation but was unable to identify a perpetrator for any of the incidents.  Carroll contends that even

_____

[14] The parties dispute the timing of the obscene phone calls. Carroll testified at trial that the calls occurred from 1994 to 1995 but started again in late 1995 to early 1996.  HCC contends that Carroll's suggestion regarding the calls re-starting is inconsistent with time frames she describes for other incidents.

though the investigations were inconclusive, HCC could have done more, such as holding meetings with employees affirming the importance of the policy against harassment.

Other conduct, such as Perez's touching or grabbing, did not present the same need for investigation as the anonymous incidents, but instead, was clearly attributable to a specific, non-supervisory employee at the time it occurred. In response to complaints about identifiable conduct of co-workers, Carroll was assured by the supervisor to whom she complained that he would "handle it." There is some evidence in the record on which a jury could conclude that Carroll's supervisors took little or no action in response to her complaints. Even though we find evidence in the record on which a jury -- and we, were we finding the facts ourselves -- might find that HCC's response was adequate, under the deferential standard of review we are required to apply,[15] we conclude that a reasonable jury also could find that HCC failed promptly to take reasonable remedial action. Thus the final element of the hostile work environment claim is met.

Even though a reasonable jury could find that Carroll established the elements of a Title VII hostile work environment sex discrimination claim, such a jury still could find that she

---

[15] "Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence. . . . Within this broad standard of deference, we must focus on whether a reasonable trier of fact could have concluded as the jury did." Harrington v. Harris, 118 F.3d 359, 367 (5th Cir. 1997).

16

failed to prove actual damages as a result of the violation. To recover compensatory damages, an employee or former employee must show more than a violation of Title VII by the employer; he or she must also show individual damages.[16] In the instant case, Carroll originally sought compensation for economic and non-economic harm. The jury found, however, that she was not fired in retaliation for complaining about the sexually hostile work environment and thus she was not entitled to economic damages for loss of her job. Carroll does not challenge that finding on appeal. The jury also found that Carroll did not suffer damages for emotional distress or other non-economic harm as a result of the workplace sexual harassment.

After the jury returned its verdict, Carroll moved for a new trial on the jury's finding of no damages for the Title VII violation. Applying the abuse of discretion standard, we find no reversible error in the district court's denial of Carroll's motion for a new trial.

In support of her claim for compensatory damages for emotional distress stemming from sexual harassment, Carroll offered her own testimony as well as testimony of a physician and a psychologist. Carroll described her fears for her physical safety at work, which led her to carry a wrench to protect herself from attacks. She

---

[16] 42 U.S.C. § 1981a (authorizing recovery for intentional violations of Title VII); Carey v. Piphus, 435 U.S. 247, 266-67 (1978).

17

also testified that she experienced high blood pressure and anxiety which she attributed to the harassment at work. Dr. John Schulze, a physician, testified that Carroll's high blood pressure, insomnia, anxiety, and fatigue were caused by stress from sexual harassment at work. Dr. Barbara Beckham, a psychologist, testified that Carroll suffered from post-traumatic stress disorder, adjustment disorder, anxiety, and depression. Beckham admitted, however, that the post-traumatic stress disorder diagnosis was controversial and in most cases would be precipitated by more extreme stressors than those experienced by Carroll. She also acknowledged that an adjustment disorder could have been caused by Carroll's legitimate termination from employment rather than from the alleged sexual harassment. Finally, Beckham acknowledged that Carroll's symptoms were mild and that overall she was in the normal range of functioning. Based on that evidence, we do not find that the district court abused its discretion in refusing to grant a new trial on the issue of damages stemming from the Title VII sexually hostile work environment violation by HCC.

V.

Intentional Infliction of Emotional Distress

We hold that Carroll failed to establish the elements of an intentional infliction of emotional distress claim under Texas law and, accordingly, reverse the jury's verdict finding HCC liable and awarding compensatory and punitive damages to Carroll on that claim. The jury found that one or more employees of HCC

18

intentionally inflicted emotional distress on Carroll and that one or more of HCC's managers confirmed, adopted, or failed to repudiate the conduct of its employees. Accordingly, the jury entered a judgment of $50,000 damages for emotional distress and $200,000 punitive damages based on malicious and willful conduct by HCC. We conclude that Carroll failed to prove the elements of her state law tort claim and, accordingly, do not reach the issues of ratification by HCC or the appropriateness of damages.

To recover for intentional infliction of emotional distress, Carroll must prove: (1) The defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.[17] Without reaching the thorny issue of employer liability for intentional torts of its employees under the first element of the claim, we find that Carroll failed to establish her claim on other elements. First, the conduct was not extreme and outrageous and, second, Carroll did not suffer severe distress.

To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[18] "[M]ere insults,

_____

[17] GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 611 (Tex. 1999).

[18] Id. (citing cases and Restatement (Second) of Torts).

19

indignities, threats, annoyances, petty oppressions, and other trivialities do not rise to the level of extreme and outrageous conduct."[19]  The standard of conduct sufficient to demonstrate intentional infliction of emotional distress is higher than that required for a Title VII hostile environment claim.[20]  For intentional infliction, however, the jury may consider <u>all</u> conduct, not just conduct "because of . . . sex."  Indeed, that distinction was the basis of the district court's refusal to grant a new trial to Carroll on the assertion that the jury's verdict, awarding no damages for the Title VII claim but awarding compensatory and punitive damages for the intentional infliction claim, was not inconsistent.

Even bearing that distinction in mind, we find that the conduct described by Carroll does not rise to the level that Texas courts previously have recognized as supporting liability for intentional infliction of emotional distress, particularly based only on the evidence within the two-year statute of limitations period, dating back to April 1, 1996.  The evidence on which the jury could find liability for intentional infliction of emotional

---

[19] <u>Id.</u> at 612.

[20] <u>McConathy v. Dr. Pepper/Seven Up Corp.</u>, 131 F.3d 558, 564 (5th Cir. 1998) (noting that "inter-office behavior can rise to the level of intentional infliction of emotional distress," but the standard for such a claim is "rigorous" and will not be lowered); <u>Prunty v. Arkansas Freightways, Inc.</u>, 16 F.3d 649, 654 (5th Cir. 1994) ("[E]ven though conduct may violate Title VII as sexual harassment, it does not necessarily become intentional infliction of emotional distress under Texas law.").

20

distress includes: (1) some of the "accidental" rubbing by Perez but not the specific grabbing incident, (2) the feces on the truck incident, and (3) the locker mobile incident.[21] Some of the ongoing casual comments, inappropriate use of terms such as "honey," instead of Carroll's proper name, obscene phone calls, and incidental touching by co-workers may also have occurred within the relevant time period. On the basis of that evidence and the high standard of "outrageousness" required by Texas law,[22] we conclude that no reasonable jury could have found that the conduct within the limitations period was "atrocious" or "utterly intolerable in a civilized community."

In addition, Carroll failed to show <u>severe</u> emotional distress as required to recover for intentional infliction of emotional distress. "Emotional distress," such as could support Title VII compensatory damages, includes all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, and worry.[23] By contrast, "<u>severe</u> emotional distress" is distress that is so extreme that no reasonable person could be expected to endure it.[24] As we already determined that Carroll did

---

[21] The car key theft, residential burglary, and Christmas gift incidents considered under the Title VII claim fall outside the limitations period for the intentional infliction of emotional distress claim.

[22] <u>Cf.</u> <u>Prunty</u>, 16 F.3d 649; <u>Soto</u>, 942 S.W.2d 671.

[23] <u>Bruce</u>, 998 S.W.2d at 618.

[24] <u>Id.</u>

not present sufficient proof of non-economic, emotional distress damages under the lower standard of Title VII, we are compelled to conclude that she did not meet the substantially higher standard required for the state tort claim. Carroll's fear, anxiety, fatigue, high blood pressure, and depression were not so severe that no reasonable person could be expected to endure such symptoms. In fact, Carroll's own psychologist testified that her symptoms were mild and that overall, she was in the normal range of functioning.

We conclude that a reasonable jury could not have found that Carroll was subjected to extreme and outrageous conduct or that she suffered severe emotional distress. We therefore reverse the entry of judgment against HCC on the claim of intentional infliction of emotional distress. Accordingly, we do not reach the issues of employer ratification of the conduct or the appropriateness of the damages awarded.

## VI.

### Conclusion

We conclude that a reasonable jury could have found that HCC maintained a hostile work environment in violation of Title VII but, nevertheless, that Carroll failed to prove individual damages as a result of the violation. The district court did not abuse its discretion in denying a new trial to Carroll on that issue. We affirm the district court in regard to the Title VII claim.

In addition, we hold that a reasonable jury could not have

22

found that the conditions and conduct to which Carroll was subjected rose to the level of "outrageousness" required under Texas law to state a claim for intentional infliction of emotional distress. We also conclude that Carroll did not experience "severe" emotional distress, another element of the state law tort claim. Therefore, we reverse the district court's entry of judgment against HCC on that theory and its award of compensatory and punitive damages to Carroll.

The judgments of the district court on which both parties appeal, accordingly, are

AFFIRMED IN PART and REVERSED IN PART.