Emma K. SOTO, Appellant,

v.

EL PASO NATURAL GAS CO., Appellee.

No. 08–95–00376–CV.

Court of Appeals of Texas,
El Paso.

Feb. 27, 1997.
Rehearing Overruled April 16, 1997.

Evelina Ortega, Caballero & Ortega, L.L.P., El Paso, Mara Asya Blatt, El Paso, for Appellant.

Kenneth R. Carr, Kemp, Smith, Duncan & Hammond, P.C., El Paso, Holly Harvel Williamson, Houston, for Appellee.

Before BARAJAS, C.J., and LARSEN and CHEW, JJ.

## OPINION

LARSEN, Justice.

Emma Soto brought suit against her employer, El Paso Natural Gas Co. ("EPNG"), for sex discrimination based on claims of sexual harassment, as well as tort claims for assault and intentional infliction of emotional distress. The trial court granted summary judgment for EPNG, which Soto has appealed. We reverse and remand for further proceedings.

### STANDARD OF REVIEW

■ In reviewing the trial court's entry of summary judgment, we employ the well-established standards of *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546 (Tex. 1985), which are:

1. The movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant is taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in her favor.

*Nixon,* 690 S.W.2d at 548–49. To prevail on summary judgment, a defendant must disprove as a matter of law at least one of the essential elements of each of plaintiff's causes of action, or it must conclusively establish one or more of its defenses. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 753 (Tex.App.—Amarillo 1995, writ denied). Here, EPNG employs both methods of obtaining summary judgment: it urges that we may not consider any evidence that occurred before the limitations period in this case, and it then urges that the incidents that took place within the relevant time period cannot support plaintiff's causes of action as a matter of law.

### FACTS

Emma Soto came to work for EPNG as a secretary in the Right of Way ("ROW") department in 1984. The summary judgment evidence, taken in the light most favorable to Soto, established that her work environment included all that follows.

ROW was a "man's world," where offensive, intimidating language and behavior by male employees toward female employees was tolerated, if not encouraged. As early as 1985, Soto complained in writing to Ralph Oppenheim, manager of ROW, about the conduct of ROW employee Tom Trujillo towards women. Soto would see the other women in the office in tears because of conduct by Trujillo and Edwin Nichols, a ROW administrator. Nichols' language towards women was very foul. He would freely refer to women as "cunts" and "bitches" in the presence of ROW director Wayne Stephens, who took no action to stop this abuse. On one occasion, Nichols told a female ROW employee to "go give *pinche* tiger [Stephens] a blow job because he was in a bad mood." On another occasion, Nichols grabbed Sam Blankenship, another female employee, by the buttocks.

In 1988–89, Soto became aware that Trujillo was calling another female employee, Maria Duarte, at home in the evenings against her wishes. Duarte reported this to ROW manager Alan Zinter, with no results. Around this time, Soto also had a bad experience with Trujillo: While talking with two draftsman in the hall, Trujillo came by, and without explanation, grabbed Soto by the elbow and marched her back to her desk. Soto reported this to her supervisor, Stephens, who said only "that's Tom," and took no other action.

Also in 1988, Soto was diagnosed with breast cancer and underwent a mastectomy. In 1990, she underwent a second mastectomy and reconstructive surgery. During this time, she heard Trujillo referring to her as "lopsided" at a department meeting where supervisors, administrators, and the ROW director were present. These people smiled and laughed at this heartless comment.

In 1990, Trujillo had a conversation with Maria Duarte and Soto in which he urged that Soto move from her job as Zinter's secretary to work for another administrator, Glen Orr, so that Duarte could work for Zinter. Soto declined to agree to this, and told Duarte she should take the job with Orr if it was offered to her, as Orr was a good person to work for. Trujillo began shouting at Soto in Spanish: "salte de aqui," [get out of here] and then "lo que pasa es que Mr. Orr te tiene satisfecha." [What has happened is that Mr. Orr has you satisfied.] Soto was offended by the sexual connotations of this remark, and reported it to Zinter, her supervisor. Zinter merely told her to ignore Trujillo and walk away from him as he would not listen to anyone. The record does not reflect any corrective action taken by EPNG personnel to stop Trujillo's lewd conduct towards women employees after this, and his offensive behavior continued.

In November 1992, Trujillo passed Soto's cubicle and said in Spanish, "tu eres como la pila de agua vendita, todos te la ..." and then made a dipping gesture with his hand. Soto testified that this comment had very pejorative sexual connotations, to the effect she was like a vessel of holy water in which everyone dipped his hand, meaning that anyone wanting sexual relations with Soto could have her. She did not report this incident at the time it happened. Her testimony was that she had become discouraged by the lack of response to her earlier complaints. In March 1993, EPNG promoted Trujillo to administrator in ROW.

As part of her job duties, Soto typed labels for ROW acquisition projects. Trujillo would request that she do this for his projects, although another female employee, Pat Lavender, was his secretary. On May 3, 1993, Trujillo asked Soto to type a label for him. Soto told him she was quite busy, had 39 labels to type before his, and that in addition, she was answering the phones. She suggested he ask Lavender to type the label. Trujillo angrily said no, threw the label on Soto's desk, and told her again to type it. The next day, Trujillo came back to the file room and asked about the label. Soto responded she had many labels to type and was very busy. Trujillo then bent down, put his face in hers, yelled "I asked you," and at the same time, leaned his hand into her left breast.[1] Soto was so shocked she felt as if she had lost consciousness. Trujillo continued to yell at her but Soto did not comprehend what he was saying. Trujillo then threatened her, saying he would tell Director Stephens she had talked back to an administrator and told her, "I better not ever catch you fooling around because I'll take care of you." Within a day, Soto went to EPNG's Human Resources department and reported Trujillo's assault.

EPNG's Human Resources department investigated Soto's charges. Although unable to directly corroborate her complaint, the investigator came to the conclusion that Trujillo's conduct was abusive and intimidating

---

1. EPNG characterizes this incident differently. It states that "while waving his arms, Trujillo allegedly inadvertently and briefly touched the area between Soto's breasts with the side of his hand." This version is without support in the record. Nothing before us indicates that the touching was accidental, nor that Trujillo touched any part of Soto's body other than her breast. Moreover, well-established summary judgment law requires us to accept Soto's account over EPNG's even if the company's version did find support in the evidence.

toward the women in ROW, creating a hostile work environment. Trujillo was warned not to talk about the complaint or the incident with Soto. He nevertheless went around ROW laughing and boasting that he had "set Human Resources straight" on Soto's complaint. He was heard making remarks such as "why would I want to touch her plastic boob?" Trujillo, despite being told to stay away from Soto, would come by her cubicle, staring and laughing at her. Trujillo's friend, Nichols, would also come by her station, make ugly faces at her, and gesture "Three Stooges" style as if to poke her in the eyes. Nevertheless, EPNG took no disciplinary action against Trujillo, and Nichols' abusive language towards women continued unabated. Trujillo had a meeting with Stephens, Zinter, and a Human Resources investigator after Soto's complaint. Trujillo's account of this meeting was that Zinter told him he "had been doing—getting along real great and doing a real good job and asked to continue to do so." According to Trujillo, Zinter also complimented him on his working relations with Pat Lavender. "[Trujillo's] understanding was that they had not found anything to support Ms. Soto's allegations." He did acknowledge that the meeting included discussion of sexual harassment charges, and under the circumstances, he was told to stay away from Soto.

Soto's story is echoed by the experiences of other women in the ROW department. One woman employee stated ROW management is feared by employees, and that they were instructed they could not go to Human Resources with their problems unless they went through ROW management first. Four months after Soto's complaint, Pat Lavender lodged a complaint against Trujillo with ROW manager Alan Zinter. She stated that Trujillo was calling her a "Northeast whore," and talking with other male employees about her personal life. Zinter's solution was that Lavender should talk it out with Trujillo. Lavender then went to Human Resources, complaining about Trujillo and about Nichols' abusive language. She reported that Trujillo had a history of abusive behavior: He had called her "slut" to her face early in her employment at EPNG, which she had reported but which had not been pursued.

Trujillo had also told Lavender that all the secretaries in ROW were "whores." Human Resources investigators noted that ROW management responded to complaints about Trujillo by saying, "Tom's just that way." The investigators also noted that "Trujillo's abrasive, abusive and intimidating behavior continues to create a hostile environment. . . ."

Soto believed that her work assignments became heavier and that she was ordered to do work that had no purpose in retaliation for her complaints to Human Resources. Soto was told by Nichols in January 1995 that she would receive a promotion. As time passed and no promotion was forthcoming, she questioned him about it. He told her there had been a "big misunderstanding" and that she should not expect a promotion.

After the May 1993 incident with Trujillo, Soto sought psychological counseling. Her counselor has found she suffers from severe depression and post-traumatic stress syndrome as a result of the hostile environment at her workplace. Soto has suffered from bouts of crying, intense feelings of helplessness and loss of control, fear of retaliation, and has difficulty concentrating and falling asleep. She has been placed on anti-depressant medication.

Soto filed suit in January 1994. Finally, in 1994, Trujillo received disciplinary action: He was demoted from administrator to his prior job as ROW specialist. Nichols was advised to fix his language only after litigation in this suit had begun. As of the time the motion for summary judgment was filed in this case, both Soto and Trujillo continued to work together in the ROW department.

### STATUTE OF LIMITATIONS

 Initially, we address EPNG's contention that because numerous incidents recounted by Ms. Soto occurred more than two years before she filed this lawsuit, or more than 180 days before she filed her Title VII charge, they are barred by limitations and may not be considered. We believe this is an overly narrow reading of the law, particular regarding Ms. Soto's sexual harassment claim based on hostile work environment.

To prove such a claim, plaintiff must establish that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986). "Whether sexual harassment at a workplace is sufficiently severe and persistent ... is a question to be determined with regard to the totality of the circumstances." *Jones v. Flagship Int'l,* 793 F.2d 714, 720 (5th Cir. 1986). A single incident or a few isolated instances of offensive sexual conduct or remarks will not be sufficient to create a hostile environment. *Id.* Thus, if Ms. Soto is to . prove her case of hostile work environment, evidence that the atmosphere in her department was tainted from the early days of her employment is certainly relevant, if not actionable. Although events *occurring more* than 180 days before Soto filed a charge of discrimination (for her sex discrimination claim) or more than two years before she filed suit (for her assault and intentional infliction of emotional distress claims) cannot be the ·basis for legal redress, nevertheless they are relevant to show the atmosphere in which those events which precipitated this lawsuit occurred. *See Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 200 (5th Cir. 1992); *Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527, 540 (5th Cir.1980)(time barred acts admissible to show current conduct); *Crawford v. Western Elec. Co.,* 614 F.2d 1300, 1314 (5th Cir.1980)(time-barred conduct relevant to show correct discriminatory practice). Thus, we will consider incidents too remote to sustain a cause of action against EPNG, not as a basis for legal consequences, but as evidence of ongoing conditions existing in the workplace.

Moreover, we believe this evidence is important in establishing whether and when EPNG knew or should have known that its ROW department was a hostile work environment for women, an element Ms. Soto must establish to prove her sexual harassment claim. Thus, we reject EPNG contention that we may not consider evidence of events that occurred outside the relevant limitations period.

## SEXUAL HARASSMENT

In a single point of error, with numerous sub-points, Soto urges that the trial court erred in granting summary judgment. Soto made claims against EPNG based upon: (1) assault by Trujillo in the course and scope of his employment; (2) intentional infliction of emotional distress; and (3) sexual harassment which constituted discrimination based on sex. EPNG argues that it is not liable for the intentional torts of its employees, and that any tortious conduct by Trujillo was outside the scope of his employment. It further argues that nothing any EPNG employee is accused of can constitute intentional infliction of emotional distress as a matter of law. As to the sexual harassment claim, EPNG argues that once complaint was finally made to EPNG's Human Resources department, remedial steps were taken, and it therefore cannot be charged with sexual harassment. It further argues that conduct can only constitute sexual harassment if the behavior is "sexual," that is, if it references sexual intercourse. We examine the sexual harassment claim first.

■ The Texas Human Rights Act makes it unlawful for an employer to discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, or national origin. TEX. LAB.CODE ANN. § 21.051 (Vernon 1996). The Human Rights Act is modeled on federal law with the purpose of executing the purposes of Title VII of the Civil Rights Act of 1964. *See Ewald v. Wornick Family Foods Corp.,* 878 S.W.2d 653, 658 (Tex.App.—Corpus Christi 1994, writ denied). Sexual harassment is a form of sex discrimination prohibited by the Act. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Syndex Corp. v. Dean,* 820 S.W.2d 869, 871 (Tex.App.—Austin 1991, writ denied). The law recognizes two types of sexual harassment claim: *quid pro quo* and hostile work environment.

■ The elements of a *quid pro quo* claim are: (1) the employee is a member of a protected class; (2) the employee is subject to unwelcome sexual advances or requests

for sexual favors by one with apparent or actual authority over the employee; (3) the harassment complained of is based on sex; (4) the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of *respondeat superior* liability. *Ewald,* 878 S.W.2d at 658–59. There is no allegation of *quid pro quo* harassment here.

The second type of sexual harassment claim, which is implicated here, is hostile environment. A hostile environment claim includes these elements: (1) the employee belongs to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Ewald,* 878 S.W.2d at 659. EPNG does not dispute that Emma Soto belongs to a protected class, nor that her work environment was affected by the conduct of which she complains. It vigorously disputes, however, that the conduct was sexual harassment, that the conduct was based on sex, and that the employer failed to take remedial action once it was informed of the conduct. We must disagree.

As they are closely related, we will examine together EPNG's first two contentions, that the conduct at issue here cannot be sexual harassment and that it was not based on sex. The essence of both these arguments is that conduct cannot be sexual harassment unless it is: (1) directed specifically at the complainant; and (2) overtly sexual in content. In fact, EPNG's argument seems to be that not only must the content of prohibited conduct be overtly sexual, it must constitute a sexual overture or it will not support a hostile environment claim. We conclude there are several problems with this analysis: it is overly narrow; it confuses the elements of a *quid pro quo* claim with those of hostile environment; and it misdefines the requirement that uninvited conduct be based on "sex" to mean "sexual act" rather than "gender" as we believe the law intended. Further, we believe that most of the conduct creating a hostile environment here was both based on gender and overtly sexual in content, so even were we to accept EPNG's narrow definition, the company is still not entitled to summary judgment.

In determining whether a hostile environment claim has been established, the court should consider the type of conduct (verbal or physical), its frequency, its offensiveness, the hostility of the conduct, whether it comes from a supervisor or co-worker, and the number of persons at whom it is directed. *King v. Hillen,* 21 F.3d 1572, 1579 (Fed.Cir. 1994). The critical inquiry is the *environment;* evidence of general work atmosphere as well as specific instances of hostility or abuse are important. *Id.; Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987). Harassment directed at other members of the same protected group is relevant to show a hostile environment. *Hillen,* 21 F.3d at 1581; *Waltman v. International Paper, Co.,* 875 F.2d 468, 477 (5th Cir.1989). Single incidents should not be viewed in isolation; it is the cumulative effect of offensive behavior which creates the work environment. *Id.*

Here, EPNG has failed to meet its summary judgment burden of proving no hostile environment as a matter of law. It urges us to consider, in isolation, Trujillo's abusive behavior on May 3, 1993. This is not the analysis the law requires: we must consider the entire work environment and the history of interaction between all employees and supervisors relevant to the hostile environment claim. We find that there is ample evidence to create a fact question on sexual harassment here. Trujillo verbally and physically intimidated Soto on numerous occasions before any action was taken to stop him. Although not her direct supervisor, he did have authority to direct her work, and her job required that she respond to his requests. Trujillo bullied other women employees in a similar way. Although Soto and others complained about his conduct to management, they were repeatedly told "that's just Tom," "ignore him," or "talk it out with

him." Similarly, we consider the conduct of administrator Nichols in assessing the hostile environment claim. EPNG urges that because Nichols never called Soto a "cunt" or "bitch" to her face, that as a matter of law his verbal abuse of women cannot form a part of her work environment. We disagree. That his vocabulary was pervasive and a matter of common knowledge within the ROW department, and that he never received counseling or discipline on it until litigation was imminent, is a relevant factor in determining the hostile environment claim.

■■■■■ Likewise, we reject EPNG's claim that nothing Soto complains of was sexual, and therefore no sexual harassment can exist. First, we do not believe this is a correct statement of the law. Harassment based on gender need not take the form of a sexual advance or contain otherwise carnal overtones to constitute prohibited sex discrimination. *Hillen*, 21 F.3d at 1583; *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir.1994)(predicate acts supporting a hostile environment claim need not be explicitly sexual); *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir.1993)(key issue in a hostile environment claim is whether members of one sex are exposed to disadvantageous conditions of employment to which members of opposite sex are not exposed); *Hicks*, 833 F.2d at 1415 (rejecting narrow definition of sexual harassment as always sexual in nature). Offensive behavior not involving sexual activity but nevertheless based on the gender of an employee, when sufficiently severe or pervasive, may create a hostile work environment. *Hillen*, 21 F.3d at 1583. Thus, even if the conduct at issue here had no sexual overtones, that alone would not preclude it from creating a hostile environment.[2]

■■■■ Second, we conclude that much of the conduct to which Soto and the other female employees in the ROW department were subjected was overtly sexual in nature.

Trujillo placed his hand on Soto's breast, obviously an act with sexual implications. He did this after making cruel jokes about her "lopsided" appearance following a mastectomy. He defended himself after the incident by denying he would want to touch a "plastic boob." He made one comment to Soto which clearly implied sexual intercourse with a ROW administrator. He made another comment which, using religious metaphor, implied sexual promiscuity. He stated that all the secretaries in ROW were whores. He called his own secretary "slut" and "Northeast whore," and discussed her private life with other male employees. Edwin Nichols routinely referred to women by an epithet *which means female sexual organ.* He would suggest, in very vulgar terms, that women employees perform sexual acts to improve a supervisor's mood. For this court to hold that these incidents were not "sexual" would require a definition of that concept new to the law, and to the world. We decline to do so.

■■■ We next examine EPNG's argument that it established as a matter of law it took prompt, adequate remedial action once it was informed of conduct that might constitute sexual harassment. EPNG urges that because it had a written policy on sexual harassment in place as of 1991, and because once Soto made a complaint to the Human Resources department an investigation was conducted, it fully complied with any obligations it had under the law. We cannot agree with this argument for several reasons.

First, we observe that EPNG mischaracterizes its own policy by maintaining that it was first placed on notice of harassment when Soto complained to the Human Resources department. EPNG policy on sexual harassment contains the following provision on reporting:

> Any employee who has a complaint of sexual harassment at work by anyone, includ-

---

2. If the conduct here consisted only of repeated physical hustling of women employees back to their work stations, laughing and staring at women employees after being told to leave them alone, making unwelcome phone calls to women employees at home, making of repeated aggressive "Three Stooges" gestures at women employ-

ees, calling women employees "stupid" and "bitch," and boasting of "setting personnel straight" when the women complained, if pervasive and intimidating enough, would probably create a hostile work environment. As there is more at issue here, we do not need to determine this question.

ing supervisors, coworkers, or visitors must bring the problem to the attention of a responsible Company official. *Employees may bring their complaint to their supervisor* or the Company EEO officer—the Senior Vice President of Human Resources or his designee. If the complaint involves someone in the employee's direct line of supervision *the employee may bring the complaint to another supervisor* or the Company EEO Officer. [Emphasis added].

The record reflects that Ms. Soto's first complaint about Trujillo to her supervisor was in 1985. She again complained in 1988, following the occasion when he ordered her to return to her work station and physically escorted her there. She complained a third time in 1990 after he made the remark about Mr. Orr "satisfying" her. She testified that her supervisors were present when Trujillo joked about her breasts being lopsided. Pat Lavender testified she had complained of Trujillo calling her a slut early in her employment. Duarte had complained about Trujillo's unwelcome calls to her home in 1988. Despite the policy language instructing employees to notify a supervisor of harassing behavior, nothing was done to investigate or correct Trujillo until 1993. Thus, we conclude that under the summary judgment record, a fact question exists as to when EPNG had notice of a hostile environment in the workplace, and whether it took sufficient remedial action to promptly correct it.

Second, there is evidence from several sources within the ROW department, including plaintiff Soto, that management actively discouraged employees from making complaint to Human Resources, that the women in the department were under the impression that they could not go to Human Resources without first going through ROW management, and that ROW director Stephens "never wanted anything to get out of the department."

Third, even after Soto and Lavender complained to Human Resources and its investigation led to the conclusion that a hostile work environment did exist, no substantive corrective steps were taken. Trujillo contin-

ued to work in the same department with the women who had made complaints. He was allowed to boast that he had "set Human Resources straight." He made comments about Ms. Soto's cancer surgery that are simply outside the bounds of decent human behavior. Nichols continued to use abusive language towards women, and made physically threatening gestures (in jest or not) toward Soto. Soto filed a charge of discrimination in October 1993, and this lawsuit in January 1994. Only in October 1993 was Nichols told to "fix" his language. In 1994, Trujillo was demoted. No punishment or corrective action is reflected in the record before that time. A fact question as to the adequacy and promptness of EPNG's response to Soto's complaints exists.

### ASSAULT

■ Soto also urges that the trial court erred in granting summary judgment on her claim of assault against EPNG, based on Trujillo's acts surrounding the untyped label. We find that a fact question exists on this issue as well.

■ An employer may be liable for the tortious conduct of its employee only if that conduct falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired. *Durand v. Moore,* 879 S.W.2d 196, 199 (Tex.App.—Houston [14th Dist.] 1994, no writ). An employer may be liable for the act of an employee, even if the act is contrary to an express policy or order, if it is done within the general authority of the employee. *Id.* Tortious conduct is within the scope of employment when it is of the same general nature as that authorized, or is incidental to that authorized. *Durand,* 879 S.W.2d at 199; *see also Southwestern Bell Telephone Co. v. Wilson,* 768 S.W.2d 755, 759 (Tex.App.—Corpus Christi 1988, writ denied).

■ Intentional torts, including assault, against another employee are not ordinarily within the scope of an employee's authority, but are most often the expression of personal animosity. *Durand,* 879 S.W.2d at

199; *Texas & P. Ry. Co. v. Hagenloh,* 151 Tex. 191, 247 S.W.2d 236, 237 (1952). If the assault is committed to accomplish a duty entrusted to the employee, rather than because of personal animosity, however, the employer may be liable. *Wilson,* 768 S.W.2d at 759. Whether the employee ceased to act as an employee and instead upon his or her own responsibility is generally a fact question. *Durand,* 879 S.W.2d at 199; *Houston Transit Co. v. Felder,* 146 Tex. 428, 208 S.W.2d 880, 882 (1948).

In May 1993 it was part of Soto's job to type labels for acquisition projects. Trujillo, although not her direct supervisor, had authority to request that she type labels for his projects (the record does not reflect whether he had authority to require that she type his labels first, as he apparently expected). He asked Soto to type a label, which she had not reached when he came back to her the next day. He became angry, berated her with his face in hers, and pushed into her breast with the side of his hand, an act which deeply shocked Soto.

The evidence, viewed in the light most favorable to the non-movant, shows that the incident occurred at the work place, during regular hours, that typing labels for acquisitions projects was a regular part of Soto's duties, and that Trujillo had relied on her to do this for him in the past. The confrontation arose from Trujillo's displeasure that Soto had not typed his label, not out of any personal animosity outside the scope of employment. Moreover, this was not the first time Soto had been ill-treated by Trujillo in this manner. ROW management had responded apathetically when Soto reported a prior incident. We conclude there is a fact question as to whether Trujillo's acts were within the scope and course of his employment, creating possible liability against EPNG.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Soto finally urges that the trial court wrongly entered summary judgment on her cause of action for intentional infliction of emotional distress. We conclude there is a fact issue here, too.

 Liability for the tort of intentional infliction of emotional distress is incurred only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, intentional infliction of emotional distress can be found where a description of the conduct would cause an average member of the community to exclaim "Outrageous!" *Horton v. Montgomery Ward & Co., Inc.,* 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied), quoting RESTATEMENT (SECOND) OF TORTS § 46, Comment d (1965). The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex. 1993). Intentional infliction of emotional distress does not include mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. *Horton,* 827 S.W.2d at 369. It is for the court to determine in the first instance whether the defendant's conduct may be reasonably regarded as so extreme and outrageous as to establish a fact question for the jury. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994).

Here, there is evidence of conduct by Trujillo which we believe establishes a fact question as to his individual liability for intentional infliction of emotional distress. Particularly, but not exclusively, his ridicule of Soto's cancer surgery, his remarks about her being "lopsided" and having a "plastic boob" are such that a reasonable fact finder could easily conclude them to be atrocious and outrageous. We can discern no purpose for such statements except to deeply wound a fellow employee. Trujillo's aggressive acts in May 1993, particularly coupled with his touching her at the site of her cancer surgery, can also be seen as extreme and outrageous.

Whether this conduct may be chargeable to EPNG is another question, but one that

we also answer in the affirmative. The actions Soto complains of all occurred in the work place, and there is no evidence of a personal animosity between Trujillo and Soto (whatever the motivation for his loutish behavior, it does not appear to have been aimed exclusively at Soto, but at all women in the department). Trujillo's ugly behavior went on, unabated, for years. Although Soto and other women within the ROW department made complaints to management about him, the summary judgment evidence indicates that no one ever disciplined, counseled, or corrected Trujillo until Soto complained to Human Resources. The evidence also shows that management personnel were present when Trujillo made at least one "lopsided" remark, responding to it only by laughing and smiling. We believe this creates a fact question as to employer liability for this intentional tort, as it does for assault as discussed in the previous section.

### CONCLUSION

Plaintiff Soto's point of error is sustained. The summary judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.