**DILLARD DEPARTMENT STORES, INC., Appellant,**

v.

**David GONZALES, Appellee.**

**No. 08–00–00111–CV.**

Court of Appeals of Texas, El Paso.

March 7, 2002.

Rehearing Overruled April 24, 2002.

## OPINION

SUSAN LARSEN, Justice.

In this sexual harassment and intentional infliction of emotional distress case, Dillard's Department Store appeals a judgment favoring its former employee, David Gonzales, following jury trial. We affirm in part and reverse and render in part.

### Facts

The evidence in this case was a swearing-match. We here outline the facts in a light favorable to the verdict, along with uncontroverted evidence whether favoring the verdict or not. In assaying factual sufficiency, we will cite additional evidence as necessary.

David Gonzales started work at Dillard's Department Store in August 1994. Although he really wanted to work in the electronics department, he accepted a position as a commissioned salesperson in the ladies' shoe department. Gonzales's supervisor was Daniel Tellez. In the beginning, Gonzales was excited about his job, but he became uncomfortable with Tellez's behavior after a few months. Gonzales described Tellez as getting "too comfortable" with him. He testified Tellez would put his hand on Gonzales's shoulder; "I didn't like the way he touched me . . . it was a caress." Tellez called Gonzales "his little pumpkin." Gonzales never mentioned his discomfiture to Tellez, nor did he complain to anyone else for some months. He tried to handle the situation by avoiding Tellez. Gonzales described Tellez's behavior as becoming more overt after a time, "[i]t was more of a come to me." At various times, Tellez would rub his back, put his arm around Gonzales's midsection, pinch his midriff, and hug or touch him with a "softness that [was] sexually suggestive."

Robert B. Gilbreath, Jenkins & Gilchrist, Dallas, for Appellant.

Alice Oliver-Parrott, Burrow & Parrott, L.L.P., Maria Teresa Arguindegui, Houston, for Appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

Besides "bearhugs," Gonzales described several specific incidents with Tellez he found offensive. For example, when they were both behind the cash register because Gonzales needed a void or an approval, both transactions requiring a manager, Tellez would come "behind my back and he just kind of like leans forward. The guy is pretty big much bigger than me. And he just rubs his—I mean, I could feel . . . his penis, like, on my back." Gonzales testified this happened on many occasions. Another time, Tellez poked Gonzales in the buttocks with a shoebox while Gonzales was assisting a customer. On June 12, Tellez instructed him to clean a display. While concentrating on the job, Tellez came up behind him, hugged him, and squeezed him. Gonzales could again feel Tellez's penis against his buttocks.

Tellez made several suggestive remarks to Gonzales. He accusing Gonzales of "flirting" with a male customer. When a co-worker was popping Gonzales's sore back during the Christmas rush, Tellez walked in, asked what they were doing, and when told said, "no, no, no. I'm the only one who can get through the back." Another time, Gonzales asked a co-worker for a stick of gum, was told he had none, and Tellez interjected, "[w]ell, I just brushed my teeth. Would you like for me to stick my tongue in your mouth?"

Gonzales first complained about this situation in October 1994 to Albert Madrid, a police officer who also worked at Dillard's as a security guard. According to Madrid, Gonzales related that he felt he was the victim of sexual harassment, and he asked for his advice on what he should do. Madrid gave Gonzales three suggestions: that he report the situation to a supervisor, all the way up the chain of command if necessary; document all incidents by keeping a journal; and find and read Dillard's sexual harassment policy. Gonzales did not do the things Madrid suggested, but simply tried to avoid Tellez as much as possible, often by hiding in the stockroom.

On May 20, 1995, Gonzales finally complained to store manager Marva Ferrero. Ferrero began an investigation, but did not speak to Tellez about Gonzales's complaint until June 12. She did have a departmental meeting within a week of the complaint. At this meeting, she told all shoe department employees, including Tellez, that no horseplay, unprofessional conduct, or touching of any kind would be tolerated at Dillard's.

June 12 was the first opportunity Ferrero had to meet with Tellez after being instructed to do so by the Dillard's corporate office.[1] At that meeting, she told Tellez there had been a harassment complaint against him, that verbal abuse, ridicule or physical contact would not be tolerated, and that he must conduct himself in a professional and positive manner at all times. Ferrero testified she found nothing to corroborate or substantiate Gonzales's claim of harassment. Tellez denied any such conduct. His written response to the charges reads: "I do not feel that these charges are in any way, shape or form are true. I do, in fact, understand Dillard's viewpoint and legal ramifications, although [I] feel that this documentation is not justified because of personal conflict with David Gonzales." Gonzales conceded that Tellez never asked him for sexual favors.

Later that day, Tellez called Gonzales into his office. Another supervisor was there as a witness. Tellez apologized to Gonzales, telling him he had not meant to

---

1. This was also the day on which Tellez hugged Gonzales from behind while he cleaned a display. Gonzales went to Ferrero, asked if she had done anything about Tellez, and was told she was still investigating.

offend him. Tellez told him he could not change the past, but would change his behavior in the future. Gonzales responded that it was too late, and walked out of the office.

Sometime in June, Gonzales and his wife took a weekend trip to San Antonio. Gonzales had requested vacation days from Tellez some weeks prior to the trip. He was startled to see Tellez at the airport, and on the same flight to San Antonio. Gonzales testified that this ruined his weekend because he feared Tellez was stalking him and he was constantly scared of running into him.

After June 12, Gonzales asked to be transferred out of Tellez's department, but Ferrero refused a transfer. Her stated reason for this refusal was that Gonzales was in a sales deficit, and was therefore ineligible for transfer. She testified that Dillard's will make no exceptions to this policy, even when the transfer is requested because of sexual harassment.

It is true that after October 1994, Gonzales was in sales deficit. In March 1995, he had a six-month performance review that reflected he was performing below standard. After he had been in deficit for ninety days, he received a letter warning him that he needed to increase his sales. On May 2, 1995, he received a letter stating he had been in deficit for 120 days, and that he would be terminated if he was in deficit for eight consecutive months. The 120 day letter also informed him his pay was to be reduced. On May 3, 1995, he was disciplined for failing to complete an assigned task. The disciplinary form stated that instead of completing markdowns on sale shoes, he had hidden the markdown stickers behind a shoebox. He made no comment in the space provided for him on the form.

Gonzales testified that having to work with Tellez damaged his efficiency because he feared the man. He did not want to come to work, he suffered from diarrhea, nervousness, moodiness, loss of sleep, and nausea. He became very depressed. In June he was arrested for public intoxication, which he attributed to his problems at work.

On August 7, Gonzales was in the shoe department when he observed Tellez brushing against another employee as he had formerly done to Gonzales. This triggered a severe bout of depression. Gonzales went into the stockroom, sat down, and "just let time pass by." He asked someone for a box cutter, went back into the stockroom, and cut his wrists. He was discovered almost immediately. A co-worker testified than when she saw him with blood on his shirt, she asked why had he done this and he replied that he had complained about Tellez sexually harassing him, and that he had failed, that nobody had paid any attention to him. An ambulance was called, and he was taken to R.E. Thomason General Hospital. He remained in the psychiatric unit at RETGH for some days, where he was handcuffed to his bed and classified as a danger to himself. He was not allowed to see his family. He was then transferred to the El Paso State Center, an experience he described as a "nightmare." Patients there would spit on him, steal his food, enter his room at night, and take his belongings. While committed to the State Center, he developed trichotillomania, a nervous disorder involving pulling out one's own hair. Gonzales's brother testified that when he visited him at the State Center, Gonzales had no eyelashes or eyebrows. He had never exhibited this hair-pulling behavior before. Gonzales never returned to work at Dillard's after August 7, 1995.

After his release from the State Center, Gonzales and his wife went to counseling. During this time, neither of them was

working and they were forced to borrow money and use food stamps. It took Gonzales two months to find another job. Finally, he discovered his wife was seeing another man. He moved out and filed for divorce. In January 1996, he took an overdose of anti-depressant drugs.

Gonzales's family members testified that after the wrist cutting incident, he changed completely. He isolated himself from the family, pulled out his eyebrows and eyelashes, had nightmares, and overdosed on pills. His sister testified he cried when he finally told her what had happened to him at Dillard's. His brother, an El Paso sheriff's deputy who runs the county jail, described his own reaction to Gonzales's breakdown:

> I could never understand why a man would do that, you know. I was raised in an Hispanic home, where if—whether it's a pro or a con, machismo plays a role, and the male is expected to be a more aggressive or—you know, I was in the defensive, I guess, mode. And when I was—I was—it was brought to my attention the reasons, I could not understand why my brother did what he did. And even now, I still don't understand why.

Gonzales's sister characterized him as having a heart of gold, good and kind-hearted, but being weak and unable to stand up for himself.

### Dillard's complaints on appeal

Dillard's complaints fall into five categories: (1) intentional infliction of emotional distress; (2) sexual harassment under the Texas Commission on Civil Rights Act; (3) exemplary damages; (4) double recovery; and (5) attorney's fees. We will address the complaints in that order.

### Intentional infliction of emotional distress

■ In its first issue on appeal, Dillard's urges that, as a matter of law, the evidence does not rise to the level required to prevail on his intentional infliction of emotional distress claim; that is, Gonzales did not prove conduct so atrocious as to exceed all possible bounds of decency. After examining the evidence in the light most favorable to Gonzales, we agree that, as a matter of law, the behavior Gonzales complains of does not meet the difficult standard for recovering under this tort.

■ An employee may recover damages for intentional infliction of emotional distress in an employment context. The employee must prove the well-established elements of the cause of action. *GTE Southwest v. Bruce*, 998 S.W.2d 605, 611 (Tex.1999). To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress suffered by the plaintiff was severe. *Id.; McLure v. Tiller*, 63 S.W.3d 72, 81 (Tex. App.-El Paso 2001, pet. filed). Courts must determine as a threshold matter whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *City of Midland v. O'Bryant*, 18 S.W.3d 209, 216–17 (Tex.2000). To be extreme and outrageous, conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Id.* at 217.

■ A defendant acts intentionally when he or she either desires to inflict emotional distress or knows that such dis-

tress is substantially certain to result from his or her conduct. *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 940–41 (Tex. App.-Beaumont 1985, writ ref'd n.r.e.). A defendant acts recklessly when the defendant " 'knows or has reason to know . . . of facts which create a high degree of risk of . . . harm to another, and deliberately proceeds to act, or fails to act, in conscious disregard of, or indifference to that risk.' " *Twyman v. Twyman,* 855 S.W.2d 619, 624 (Tex.1993); *McLure,* 63 S.W.3d at 81.

In reviewing Gonzales's action for intentional infliction of emotional distress against his former employer, we are guided by the Texas Supreme Court case of *GTE Southwest v. Bruce,* 998 S.W.2d 605, 611 (Tex.1999). There, several employees brought suit against GTE based upon the behavior of their supervisor. Initially, the Supreme Court discussed emotional distress claims in the employment context, adopting a strict approach to emotional distress claims arising in the workplace, explaining that to properly manage a business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees, and "[a]lthough many of these acts are necessarily unpleasant for the employee, an employer must have latitude to exercise these rights in a permissible way, even though emotional distress results." *Id.* at 612. Even where a supervisor abuses a position of power over an employee, the employer will not be liable for mere insults, indignities, or annoyances that are not extreme and outrageous. *Id.* at 617.

The court nevertheless noted that liability may arise when one in a position of authority engages in repeated or ongoing harassment of employees, where the cumulative quality and quantity of the harassment is extreme and outrageous. When such repeated or ongoing harassment is alleged, the offensive conduct is evaluated

as a whole. *Id.* at 616. The court then observed that it is a question of law for the court, in the first instance, to decide if the defendant's conduct is so extreme and outrageous as to permit recovery. *Id.* It found that the conduct complained of by the *Bruce* plaintiffs was indeed extreme and outrageous. The supervisor's conduct there included using the harshest, most vulgar obscenities; repeatedly physically and verbally threatening and terrorizing employees; "charging" employees by rushing up to them with balled fists and lowered head, stopping uncomfortably close to them while yelling; pounding fists; flying into a rage because one employee left her purse on a chair and another her umbrella on a filing cabinet; repeatedly threatening to terminate employees without justification; forcing an employee to stand in front of him for as long as thirty minutes while he reviewed papers and talked on the phone; screaming when he discovered a spot on the carpet, forcing an employee to clean spots on her hands and knees; forcing employees to vacuum nightly although GTE employed a janitorial service for that purpose; and forcing an employee to wear a post-it on her shirt that said, "don't forget your paperwork." In finding this conduct rose to the level of intentional infliction of emotion distress, the Supreme Court held:

> We recognize that, even when an employer or supervisor abuses a position of power over an employee, the employer will not be liable for mere insults, indignities, or annoyances that are not extreme and outrageous. But [the supervisor's] ongoing acts of harassment, intimidation, and humiliation and his daily obscene and vulgar behavior, which GTE defends as his 'management style,' went beyond the bounds of tolerable workplace conduct. The picture painted by the evidence at trial was unmistakable: [the supervisor]

greatly exceeded the necessary leeway to supervise, criticize, demote, transfer, and discipline, and created a workplace that was a den of terror for the employees. And the evidence showed that all of [his] abusive conduct was common, not rare. Being purposefully humiliated and intimidated, and being repeatedly put in fear of one's physical well-being at the hands of a supervisor is more than a mere triviality or annoyance. *Bruce*, 998 S.W.2d at 617 [internal citations omitted].

The evidence outlined in *Bruce* is a far cry from that described here. Reviewing the evidence in a light favorable to Gonzales, we find that his workplace was not even close to the "den of terror" described in *Bruce*. Here, we have a supervisor who hugged his employee, called him pet names, put his hand on his shoulder, rubbed his back, and, in the presence of others, made off-color remarks implying homosexuality. He leaned against Gonzales in such a way that Gonzales could feel his genitals. (Nothing in the record implies that Tellez was aroused during these contacts.) Gonzales did not ask Tellez to stop this conduct, but instead avoided him. It is undisputed that Tellez never asked Gonzales for sexual favors. Moreover, as soon as Tellez learned that his conduct was offensive to Gonzales, he apologized and changed his behavior. There is no evidence that Tellez screamed at Gonzales, used obscenities, lost his temper, threatened him, forced Gonzales to perform menial tasks outside his job duties, or ridiculed him.

This is simply not a situation beyond all possible bounds of decency, atrocious, and utterly intolerable in a civilized society. Tellez's behavior, as outlined by Gonzales, was no doubt inappropriate, annoying, and crude. That it implied homosexual behavior apparently made it particularly unwel-come to Gonzales, but it is this Court, and not the individual plaintiff, setting the threshold standard. We find nothing in the law of intentional infliction of emotional distress mandating a lower standard for homosexual, rather than heterosexual, boorishness. Nothing in this record, moreover, indicates that Tellez acted with the intent to inflict emotional distress on Gonzales, nor that he acted with reckless disregard for Gonzales's emotional well-being. Although his conduct may have been offensive to a sensitive employee, particularly one threatened by references to homosexual activity, Tellez's behavior did not rise to that high level of atrociousness required to sustain a judgment for intentional infliction of emotional distress. Dillard's first issue on appeal is sustained.

### Sexual harassment

In his second issue on appeal, Dillard's urges that judgment based upon sexual harassment cannot stand because Gonzales failed to prove either *quid pro quo* or severe and pervasive misconduct. Dillard's brings both legal and factual sufficiency challenges to the sexual harassment judgment. In reviewing this issue, we utilize the well-established standards regarding legal and factual sufficiency of the evidence. *McLure*, 63 S.W.3d at 72, 80.

The Texas Commission on Human Rights Act (TCHRA) makes it unlawful for an employer to discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, or national origin. TEX. LAB. CODE ANN. § 21.051 (Vernon 1996). The TCHRA is modeled on federal law with the purpose of executing the purposes of Title VII of the Civil Rights Act of 1964. *Soto v. El Paso Natural Gas*, 942 S.W.2d 671, 677 (Tex.App.-El Paso 1997, pet. denied). Sexual harassment is a form of sex

discrimination prohibited by both Acts. *Id.* Same-sex sexual harassment is actionable under Title VII. *Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 82, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). We conclude that same-sex sexual harassment is likewise actionable under TCHRA, and Dillard's does not contend otherwise.

■ The law recognizes two types of sexual harassment claim: *quid pro quo* and hostile work environment. *Soto,* 942 S.W.2d at 677. Here, Gonzales relies upon both theories to support his sexual harassment judgment.

### *Quid pro quo*

■ To establish a *quid pro quo* claim, a plaintiff must prove: (1) a supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship. *Wal–Mart Stores v. Itz,* 21 S.W.3d 456, 470 (Tex.App.-Austin 2000, pet. denied). Because we find sufficient evidence to support a sexual harassment claim under the hostile environment theory, we need not discuss this claim. We instead proceed to the hostile environment evidence.

### Hostile environment

■ The jury found that David Gonzales was subjected to sexual harassment by Dillard's Department Stores because he was subject to sexual advances and/or other conduct of a sexual nature that was unwelcome and undesirable or offense to him; that the conduct was directed at him because of his gender; the harassment was so severe and pervasive that it altered a term, condition, or privilege of employment; and it was committed by his supervisor, Danny Tellez. To establish a hostile environment claim against his employer, based upon the conduct of his supervisor, Gonzales bore the burden of establishing these elements: (1) a supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct (5) that is severe and pervasive (6) creating an abusive work environment that (7) affects a term, condition, or privilege of employment. *Itz,* 21 S.W.3d at 472. In determining whether a hostile environment has been established, the court should consider the type of conduct (verbal or physical), its frequency, its offensiveness, the hostility of the conduct, whether it came from a supervisor or co-worker, and the number of persons at whom it is directed. *Soto,* 942 S.W.2d at 678. The critical inquiry is environment: evidence of general work atmosphere as well as specific instances of hostility or abuse are important. *Id.* Single incidents should not be viewed in isolation; it is the cumulative effect of offensive behavior which creates the work environment. *Id.*

■ A jury may determine from all the circumstances whether " 'a reasonable person would find [the environment] hostile or abusive,' " provided the plaintiff personally and subjectively perceived the environment to be abusive. A showing of " 'tangible psychological injury' " such as a nervous breakdown is not required. *Itz,* 21 S.W.3d at 472 (quoting *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Here, we believe a jury could reasonably conclude Gonzales was subjected to a hostile environment as defined under sexual harassment law. Tellez, his immediate supervisor, pressed up against him so that he could feel the man's penis on "many occasions." Tellez made suggestive remarks about "going through the back," sticking his tongue in Gonzales's mouth, and flirting with male customers. He called Gonzales and other employees his "little pumpkins." He stroked, rubbed, and patted Gonzales in a caressing way. He poked

Gonzales in the buttocks with a shoebox. This behavior, subjectively, was highly offensive to Gonzales. We conclude a reasonable employee in Gonzales's position would find it offensive, as well.

There is evidence that others were subjected to similar conduct in the ladies' shoe department. Gonzales testified:

> I would observe Danny going up to other sales associates in the department, on the department floor, and he would approach them the way he would approach me, too.. He would, I mean, come to the back and, you know, Hey, how are you doing? You know, just—I mean, basically, just hugging them, getting them close to his penis. And I mean, getting them, like, running his hands through the back, you know. And I observed a lot of staff members from the department that were uncomfortable with it. I saw it on their faces—
>
> . . .
>
> I never observed Danny doing it to any of the girls in the department, my department, the ladies shoes. But I did observe it to . . . other male—some of the shoe department staff members.

Kevin Collier, a former shoe department employee testified that a co-worker approached him and told him about a conversation between the co-worker and Tellez. Tellez had inquired about the employee's sexual orientation, about where he liked to "hang out," and if it would be possible for Tellez to meet him after work. Although the co-worker seemed pleased about the conversation, Collier found it inappropriate because Tellez, a supervisor, was approaching employees in the workplace. Officer Madrid, the security guard, testified that other employees came to him to complain of Tellez touching them. On August 7, the event which triggered Gonzales's suicidal gesture was observing Tel-

lez brushing up against another employee, buttocks to genitals, as he had done to Gonzales. Lorena Garcia, another employee, was waiting at Dillard's elevator and watched as Tellez approached an employee named Andrew, "hugged him real hard and pulled him up." People observing this "made faces." Jaime Frias, another employee, testified that he had been touched by Tellez in a way that made him uncomfortable, that Tellez had hugged him, rubbed his lower back, and stroked it in circular motions.

We note that although the law does not require a "tangible psychological injury," such as a breakdown, there is ample evidence of such an outcome here. Gonzales, during the work day, cut his wrists with a box cutter; he spent weeks in a psychiatric facility as a result of this. He developed a nervous disorder which his family testified had never been present before his hospitalization following the suicidal gesture. He later attempted a drug overdose.

Thus, we find that there was more than a scintilla of evidence from which the jury could find a hostile environment, both from the viewpoint of a reasonable person and from Gonzales's own. Tellez's objectionable behavior was apparently frequent, it involved both suggestive touching and off-color remarks. Although not physically threatening, we think the evidence supports a finding that Gonzales found Tellez's conduct offensive, as did other employees.

As to factual sufficiency, we note that Dillard's submitted much evidence contradicting Gonzales's version of events. Ferrero concluded after her investigation that there was no corroboration or substantiation for Gonzales's claim against Tellez. Tellez himself categorically denied that any of the events related by Gonzales had ever occurred. Tellez testified he had no idea that Gonzales would be on the same

flight he took to San Antonio. Collier never saw any inappropriate behavior by Tellez toward Gonzales. Gonzales testified that Tellez never asked him for sex. It was Dillard's theory that Gonzales was simply a poor employee, who had fabricated the whole story about Tellez in order to avoid being fired for his sales deficit, and perhaps obtain a transfer from the ladies' shoe department. This was supported by testimony from Raul Roberto Garcia, who stated that Gonzales told him he was not happy with his treatment by Dillard's, that he had been cheated because he was in deficit, and suggested to Garcia that they could avoid being fired by telling management that Tellez had touched them, and their deficit was because of this uncomfortable working situation. Garcia had never seen Tellez touch Gonzales. Three other employees testified they had never seen Tellez touch Gonzales inappropriately. The jury was, of course, free to reject any or all of this testimony. We find factually sufficient evidence to support the jury's verdict on this issue.

### Term, condition, or privilege of employment

■ Having found that sufficient evidence supports the jury's findings that Gonzales was subjected to unwelcome, offensive conduct of a sexual nature and that the conduct was directed at Gonzales because of his gender, we turn to the issue of whether there is evidence that the harassment affected a term, condition, or privilege of Gonzales's employment. Gonzales asserts he was constructively discharged, and the jury so found.[2]

Dillard's has not addressed the specific questions of legal and factual sufficiency of the evidence to support a finding of constructive discharge. Failure to brief an issue waives error. Tex.R.App. P. 38.1(f); *Tarrant County Water Control & Improvement Dist. Number One v. Fullwood,* 963 S.W.2d 60, 73–74 (Tex.1998). Although we find that Dillard's has not adequately addressed the question of constructive discharge, nevertheless we will discuss it in the interest of justice.

■ To find a constructive discharge, it must be determined whether or not a reasonable person in the employee's position would have felt compelled to resign as a result of the employer's discriminatory conduct. *Green v. Industrial Specialty Contractors,* 1 S.W.3d 126, 134 (Tex.App.-Houston [1st Dist.] 1999, no pet.). A finding of constructive discharge must be based upon harassment of a greater severity or pervasiveness than the minimum required to prove a hostile work environment. *Id.* Nevertheless, it is the conditions imposed which control, not the employer's state of mind. *Borg–Warner Protective Services Corp. v. Flores,* 955 S.W.2d 861, 866 (Tex.App.-Corpus Christi 1997, no pet.). Thus, a plaintiff need not prove that the employer subjectively intended to force the resignation. *Id.*

Here, once Gonzales had reported the harassment to Ferrero, he was never informed of the results of any investigation. Gonzales continued to work under Tellez's

---

**2.** The constructive discharge instruction is actually a part of jury question 1, which inquired as to Gonzales's *quid pro quo* claim. Although we have not reached that claim, we see no reason why the jury's finding on that issue does not apply to the hostile environment claim, as well. The instruction read: "An employee is considered to have been discharged when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Dillard's did not object to this definition, and in fact the instruction tracks court-approved language. *Green v. Industrial Specialty Contractors,* 1 S.W.3d 126, 134 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

supervision throughout this time. Although he requested a transfer from Tellez's department, Ferrero categorically refused it, stating it was contrary to Dillard's policy to transfer an employee in sales deficit. Tellez grabbed Gonzales and pressed himself against plaintiff even after Gonzales had complained to Ferrero and she had purportedly initiated an investigation. We find it is reasonable that a jury conclude Gonzales was constructively discharged, in that he felt he had no alternative but to "remain in the department, endure Tellez' conduct, and accept whatever happens in order to keep [his] job." We overrule Dillard's second issue.

### Dillard's anti-harassment policy

In its third issue, Dillard's claims it proved as a matter of law that it had a reasonable anti-harassment policy, which Gonzales failed to invoke for many months, and when he did, Dillard's management acted promptly and effectively.

An employer may avoid liability by pleading and proving that it had a policy in place to prevent or correct sexual harassment and that plaintiff unreasonably failed to take advantage of it. *Itz,* 21 S.W.3d at 472 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 806–07, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The defense is not available, however, where the harassment results in tangible employment action " 'such as discharge, demotion, or undesirable reassignment.' " *Id.* at 472–73 (quoting *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275, 141 L.Ed.2d 662).

Whether an employer's action in response to a sexual harassment claim is sufficient necessarily depends on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of initial remedial steps. *Wal–Mart Stores v. Davis,* 979 S.W.2d 30, 37 (Tex.App.-Austin 1998, pet. denied). Even

where the employer takes some remedial steps, it will still be liable if its actions were not reasonably calculated to stop the harassment. *Id.*

Here, Gonzales relies upon his constructive discharge as a tangible employment action precluding this defense. Having agreed there was sufficient evidence to sustain the jury's finding of constructive discharge, we find this defense was unavailable to Dillard's. Nevertheless, because we think the constructive discharge evidence is closely intertwined with what Dillard's did, or failed to do, once Gonzales reported the harassment, we will examine the evidence on this issue.

Dillard's had a general anti-harassment policy, found in its employee handbook, which read:

> It is the policy of the Company to treat all individuals equally in their terms and conditions of employment. The harassment of any associate or customer by supervisors or other associates is contrary to this policy and will be considered justification for disciplinary or other appropriate action.

Marva Ferrero, store manager, admitted that she had never received any training on sexual harassment issues, nor on possible remedies should the problem arise. Dillard's provided no brochures or guides on sexual harassment. Management received no counsel by the store's lawyers, either. Ferrero admitted "if I had more background, perhaps I could have done a better job in this situation." From Gonzales's complaint to her on May 20, 1995, it was three weeks before Ferrero finally met with Tellez about the allegations. She testified it took this long because she was following the steps outlined for her by the corporate office. She never told Gonzales the results of her meeting with Tellez. Instead, she gave him general assurances

that "things should get better." She refused to consider Gonzales's request for a transfer because there was a no-exceptions policy that employees in sales deficit could not be transferred. This, although she was aware that an employee's work could be substandard precisely because of sexual harassment by a supervisor.

Kevin Collier testified that it was his experience as a Dillard's employee that sexual harassment was not taken seriously. He never received any training on the specific subject at Dillard's. General harassment training took about ten minutes during employee orientation lasting several days. Collier also testified that employees in sales deficit were sometimes allowed to informally transfer to a higher volume department to increase their sales, pending a formal transfer.

Robert McGushin, Dillard's vice-president and director of stores, did not know of any sexual harassment training ever given within the corporate hierarchy. He never received any training in his eighteen years at Dillard's. He opined that having a supervisor of the opposite sex investigate the claim was not a problem, although Gonzales testified he was embarrassed and humiliated to be interviewed by a woman on the subject, so much so that he could not tell her about certain incidents, such as Tellez pressing his penis against Gonzales's backside.

We find Dillard's did not establish its affirmative defense as a matter of law, and that there was sufficient evidence to support the jury's negative answer to the question: "Did DILLARD DEPARTMENT STORES, INC. exercise reasonable care to prevent and correct promptly any sexual harassing behavior?"

We therefore overrule Dillard's issue three urging it had conclusively established the affirmative defense that it had a reasonable anti-harassment policy which

Gonzales failed to invoke, and that when he finally did, Dillard's responded promptly and effectively.

### Exemplary damages

In its fourth issue on appeal, Dillard's challenges the judgment's award of exemplary damages. In cases claiming employment discrimination, the Texas Labor Code limits recovery for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and punitive damages to a total of $300,000 in the case of a defendant which has more than 500 employees. TEX. LAB. CODE ANN. § 21.2585(d)(4) (Vernon 1996 & Supp.2002). The jury awarded $730,000 for these elements of damage, and the trial court properly reduced them to the statutorily mandated amount of $300,000.

Dillard's contends that the exemplary damage award of $5 million must then be premised upon the finding that Dillard's was liable for intentional infliction of emotional distress. We agree. Because we have found that the conduct here did not, as a matter of law, constitute intentional infliction of emotional distress, the exemplary damage award cannot stand. Dillard's fourth issue on appeal is sustained.

### Double recovery

Dillard's fifth issue contends that the judgment here constitutes a double recovery because it awarded two sets of compensatory damages—one for sexual harassment and one for intentional infliction of emotional distress. As we have found Gonzales cannot recover on his emotional distress claim, the only damages recoverable are those for sexual harassment. No double recovery issue remains. The fifth issue on appeal is overruled.

## Attorney's fees

Finally, in its sixth issue, Dillard's claims the trial court erred in awarding attorney's fees at double the customary hourly rate, based on factors not properly considered because they may not be used to increase a lodestar calculation, and because they were not supported by the evidence. It requests either a remittitur or remand for new trial on this issue. We review a court-ordered award of attorney's fees for abuse of discretion. *Crouch v. Tenneco*, 853 S.W.2d 643, 646 (Tex.App.-Waco 1993, writ denied).

The court may allow a prevailing party under the TCHRA a reasonable attorney's fee as part of costs. TEX. LAB. CODE ANN. § 21.259(a) (Vernon 1996). Here, the court used a "lodestar" method of determining fees, where it first determines the number of hours reasonably spent by counsel on the matter, then multiply those hours by an hourly rate the court deems reasonable for similarly complex, non-contingent work. *Flores*, 955 S.W.2d at 870. The lodestar figure may then be adjusted for factors known as multipliers, including the complexity of the case, the skill of the attorney, whether the fee is contingent, and the novelty of the issues raised. *Id.* Formulated another way, the trial court may adjust the lodestar amount to account for factors first listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required; (4) the effect on other employment by the attorney; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the attorney's relationship with the client; and (12) awards in similar cases. *Guity v. C.C.I. Enterprise, Co.*, 54 S.W.3d 526, 529 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (citing *Johnson*, 488 F.2d at 717–19). If some of these factors are accounted for in the lodestar amount, they should not be considered when making adjustments. *Guity*, 54 S.W.3d at 529.

Here, Dillard's contends that the fee assessed was excessive because the trial court improperly doubled the hourly rate based upon: (1) the novelty and difficulty of the issues; (2) the contingent nature of the fee; (3) time limitations imposed by the circumstances; and (4) preclusion of other employment.

First, we note that this was indeed a case involving novel and difficult issues; when attorney Steve Spurgin accepted the case in August 1995, the Fifth Circuit had specifically rejected the notion that same-sex harassment was actionable under Title VII. *Oncale v. Sundowner Offshore Services*, 83 F.3d 118 (5th Cir.1996), *rev'd*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Texas courts follow federal law in cases involving employment discrimination, so to accept a same-sex harassment case in 1995 involved not just an uphill battle, but an exercise in windmill tilting. The trial court was fully justified in taking this into account in enhancing the fee based upon this factor.

Second, Dillard's contends that it was error to rely upon the contingent nature of the fee in enhancing attorney's fees, based upon U.S. Supreme Court authority.[3] Recovery on the sexual harassment claim

---

**3.** Dillard's does not cite us to a U.S. Supreme Court case in making this assertion, but we presume it refers to *City of Burlington v. Da-* *gue*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

here was grounded in state law, however, not federal law, and therefore the U.S. Supreme Court's preclusion of this as a factor in federal cases does not control. Texas courts consistently allow the use of a multiplier based upon the contingent nature of a fee under Texas statutes allowing recovery of attorney's fees. *Guity v. C.C.I. Enterprise Co.*, 54 S.W.3d 526, 529 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *Borg–Warner Protective Services v. Flores*, 955 S.W.2d 861, 870 (Tex.App.-Corpus Christi 1997, no pet.); *Crouch v. Tenneco*, 853 S.W.2d 643, 648 (Tex.App.-Waco 1993, writ denied). Moreover, we note that at least one state court has specifically rejected the U.S. Supreme Court's ban on a contingency multiplier in interpreting its own state anti-discrimination statute. *See Rendine v. Pantzer*, 276 N.J.Super. 398, 648 A.2d 223, 254 (1994) (holding that trial judge correctly considered contingent nature of fee in doubling the lodestar, rejecting *Dague* after extensive discussion), *aff'd as modified*, 141 N.J. 292, 661 A.2d 1202 (1995). Considering this, we cannot find the trial court acted without reference to guiding principles.

As to time limitations and preclusion of other employment, there was ample evidence that this was a "daily basis" case. Spurgin had one employee, originally hired to do intake, who worked full-time with plaintiff David Gonzales. Everyone else in the firm spent substantial time with Gonzales, as well. Spurgin gave up thirteen to fifteen plaintiffs in an employment suit against Levi–Strauss, without retaining any interest in their recovery, because he could not devote sufficient time to both that case and the one here. Gonzales was the most time-intensive client he ever had, and he was forced to turn away much business as a result. The trial court did not abuse it discretion in using this factor as a multiplier.

We conclude there was no abuse of discretion in the award of attorney's fees here. Dillard's issue six is overruled.

### Conclusion

Judgment for David Gonzales on his claim of intentional infliction of emotional distress is reversed and rendered that Gonzales take nothing on that claim. We also reverse and render the exemplary damages award. Judgment for David Gonzales on his claim for employment discrimination under the TCHRA is affirmed, including the attorney's fee award. Thus, we affirm the award for lost wages in the amount of $10,000 and compensatory damages in the amount of $300,000, with interest on these amounts calculated in the same manner as in the Amended Final Judgment. We also affirm the attorney's fee award of $421,085 for representation before the trial court, with provisional awards of $75,000 for representation in the court of appeals and $25,000 in the Texas Supreme Court.