Deborah EWALD, Appellant,

v.

WORNICK FAMILY FOODS CORPORATION, Appellee.

No. 13–92–515–CV.

Court of Appeals of Texas, Corpus Christi.

June 9, 1994.

Aaron Pena, Jr., Edinburg, for appellant.

John E. McFall, Eric J. Senske, McFall & Ashcraft, Steven L. Rahhal, Kimberly N. Lonergan, McFall & Associates, Dallas, for appellee.

Before SEERDEN, C.J., and GILBERTO HINOJOSA and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

Deborah Ewald sued Wornick Family Foods and Oscar Alonzo alleging sexual harassment and retaliatory discharge under the Texas Commission on Human Rights Act, assault and battery, and intentional infliction of emotional distress. These claims arose out of Ewald's employment with Wornick. The trial court rendered an interlocutory default judgment in favor of Ewald and against Alonzo for $50,000. The trial court rendered a take-nothing final summary judgment in favor of Wornick. Ewald appeals raising one point of error asserting that the trial court erred in granting summary judgment in favor of Wornick. We affirm in part and reverse and remand in part.

As summary judgment evidence, Wornick submitted excerpted portions from Ewald's deposition testimony, along with affidavits from Carlos Perez, direct supervisor over

several production crews for Wornick including the crew of which Alonzo was crew leader, Bob Garcia, Wornick's operations manager, Sonny Cavazos, Wornick's vice president of operations, and Lee Westfield, Wornick's general manager.

In response to Wornick's summary judgment evidence, Ewald submitted affidavits from Cynthia Garcia, who at the time worked in Wornick's personnel office, and Carmen Zapata, who at the time was a crew leader for Wornick.

Sometime before November 1, 1990, Ewald was assigned to work on a production crew led by Oscar Alonzo. Ewald claims that on several occasions before November 1, 1990, Alonzo made crude and offensive comments to her. She considered the comments sexual in nature, and felt sexually harassed. On November 1, 1990, Ewald claims that Alonzo grabbed her hands and brushed his pelvic area against her while the two were alone in a cooler in the production area. Ewald was frightened, broke away from Alonzo, and immediately left the company's premises. She did not report to work or call in at any time between November 2, 1990, and November 8, 1990. Ewald explained that no one witnessed the incident and that she did not report this or any other incident involving Alonzo to management, to a supervisory employee, or to the personnel department until November 6th or 7th of 1990.

On the 6th or 7th, Ewald telephoned the company to tell them she was quitting. She spoke with a secretary and told her that she was quitting because she was being harassed by Alonzo and she could not take it anymore. The secretary gave Ewald's complaint to the personnel department.

Delia Flores, the Personnel Director, immediately began an investigation. Flores telephoned Ewald on November 7, 1990, and asked Ewald to come in to discuss her allegations. In a written statement and discussion with Flores, Ewald explained that she had been repeatedly subjected to sexual and offensive remarks by Alonzo, and that on November 1, 1990, he had touched her in a sexual manner that she found offensive.

Carlos Perez had direct supervisory responsibility over several production crews. Alonzo was a crew leader over one of the crews Perez supervised. Perez supervised Alonzo and his crew from January 1990 until November 7, 1990, the date Alonzo's employment was terminated. Perez reported to Robert Whitaker, the company's Production Manager.

During mid-March 1990, Whitaker advised Perez that a female production employee had complained about Alonzo's use of sexual or vulgar language. Perez averred that he was present on March 15, 1990, when Bob Garcia and Whitaker discussed this complaint with Alonzo. During that meeting, Alonzo did not deny his use of foul language and assured Whitaker and Perez that he would change his behavior and that no similar incident would ever happen again. Garcia advised Alonzo that his employment would be terminated immediately if an incident such as this ever happened again.

Perez "kept a close eye on Alonzo" after the March meeting and "noticed a significant improvement in his behavior." Daily, he noticed Alonzo was "making a conscious effort to refrain from using any language which others might consider crude or offensive." On November 7, 1990, Flores informed Perez of Ewald's complaint regarding Alonzo. Perez met with Flores and Ewald and informed Ewald that the company wanted her to return to work on a different crew. Because of Ewald's complaint and the March warning, Alonzo was terminated on the evening of November 7, 1990.

Within a week, Ewald returned to work on a different crew. Ewald told Perez that she feared Alonzo's "friends" and co-workers might harass her for causing Alonzo's dismissal. Perez told her again that he would not put her on the same crew and that if she experienced any harassment to see him, as her supervisor, immediately. Perez attested that at no time after this did Ewald inform him that she was being harassed.

Perez averred that he gave Ewald a verbal warning on November 21, 1990, for violating the company's attendance and punctuality policy. She had failed to report to work and had not informed any company representa-

tive that she would not be reporting to work. Ewald acknowledged that she had violated the policy and said she would improve her attendance. She told Perez that she missed work because she was having difficulty finding rides to work and because she was responsible for a baby's care. Perez averred that he had offered to help her with transportation to work and on one occasion agreed to pick her up and bring her to work, but, when he arrived at her home, she was not there.

Perez gave Ewald a written warning on November 27, 1990, for being absent for three consecutive days without informing the company that she would be absent. Ewald acknowledged that she could be fired for not following the company's attendance policy. Perez told Ewald that she would be given one more chance to follow the policy and he affirmed that she thanked him for not firing her. Perez told her at the conclusion of the meeting that similar absences would not be tolerated, and that if it happened again her employment would be terminated.

In early December 1990, Julian, Ewald's new crew leader, informed Perez that Ewald had failed to come to work or call in for three consecutive days. Perez reported Ewald's absences to Flores and it was agreed that Ewald's employment should be terminated based upon her previous repeated attendance violations. Ewald's employment was terminated on December 11, 1990.

Ewald admitted that she was familiar with the company's attendance policy as she was given a copy of the attendance policy on the day she was hired, read it immediately and understood its contents. She agreed that she violated the policy in accordance with the oral warning, the written warning, and that termination was an appropriate disciplinary action. She does not complain that the attendance policy was discriminatorily applied to her.

Ewald claims that her absences throughout the second half of November and the first part of December 1990 were caused by the fact that she received "dirty looks" and was the subject of unspecified "rumors" as a result of Alonzo's termination.

The company's production facility was permanently closed on April 26, 1991. There were frequent layoffs during the months preceding the closing. No one from Ewald's crew was retained and none of the former hourly employees had any "transfer rights" to any other place of employment.

Ewald filed suit in July 1991 against Alonzo and Wornick Family Foods. On June 5, 1992, the trial court entered an interlocutory default judgment against Alonzo. The company filed a motion for summary judgment on all grounds asserted by Ewald. The trial court granted summary judgment for the company rendering that Ewald take nothing.

■ To sustain a summary judgment, we must determine that the summary judgment evidence establishes as a matter of law that no genuine issue of material fact exists and that the movant is entitled to judgment. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970). We accept all evidence favorable to the nonmovant as true, indulge every reasonable inference in the nonmovant's favor, and resolve any doubt in the nonmovant's favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex. 1985). When a defendant moves for summary judgment on several theories and the trial court enters judgment without specifying the ground relied upon, we affirm the summary judgment if any one of the theories advanced is meritorious. *Benavides v. Moore*, 848 S.W.2d 190, 192 (Tex.App.—Corpus Christi 1992, writ denied).

■ A defendant who moves for summary judgment must show that at least one element of plaintiff's cause of action has been conclusively established against the plaintiff. *Id.* at 195. Once the defendant has negated an element of the plaintiff's cause of action, the plaintiff has the burden of introducing evidence that raises an issue of fact with respect to that element. *Id.*

**Summary Judgment Affidavits**

■ Wornick asserts that the affidavit of Zapata is improper summary judgment evidence and should be struck. Wornick asserts that Zapata did not explain the basis of her alleged personal knowledge in connection

with Alonzo's employment status with Wornick. We disagree.

Zapata, by her affidavit, stated that all of her statements contained in the affidavit were based upon her own personal knowledge. By her affidavit she explained how she became familiar with Alonzo and her position with Wornick. Her statements were about things she saw Alonzo doing. We conclude that Zapata's affidavit was proper summary judgment proof.

### Sexual Harassment

Ewald asserts that Alonzo was a supervisor for the company and that he sexually harassed her. By her petition, Ewald asserts that Wornick knew or through the exercise of ordinary care should have known of the existence of the sexually discriminatory conduct and that there was a likelihood of someone being injured. Ewald's petition further asserts that she was subjected to *quid pro quo* harassment, in that she was subjected to sexually harassing remarks and requests for sexual favors from Alonzo who implied that her acquiescence would assure her success as an employee with Wornick. Additionally, Ewald claims that she complained about the acts of her supervisor's harassment. Unable to continue working under continued harassment, she asserts that "she was constructively discharged when she was forced to quit." After Wornick terminated Alonzo's employment, Ewald returned to work expecting a harassment-free environment. She claims that after returning to work she continued to suffer discriminatory treatment and retaliation.

■ It is unlawful under the Texas Human Rights Act for an employer to discharge an individual or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, or national origin. Tex. Rev.Civ.Stat.Ann. art. 5221k, § 5.01(1) (Ver-

non 1987).[1] The Legislature modeled the Texas Human Rights Act on federal law with the purpose of executing the policies embodied in Title VII of the federal Civil Rights Act of 1964. *See* Tex.Rev.Civ.Stat.Ann. art. 5221k § 1.02(1) (Vernon Supp.1994). Sexual harassment is recognized as employment discrimination. *Syndex Corp. v. Dean*, 820 S.W.2d 869, 871 (Tex.App.—Austin 1991, writ denied) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). A claim of sexual harassment may be actionable as *quid pro quo* harassment or hostile work environment harassment. *Id.*

■ *Quid pro quo* sexual harassment is discriminatory behavior by a supervisor that compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. *Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 648 (6th Cir.1986). In a *quid pro quo* action, the employee bears the burden of proof to support charges that submission to the unwelcome sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employee's failure to submit to the sexual demands of supervisory employees. *Id.* (citing *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982)).

■ The elements of a *quid pro quo* claim of sexual harassment are: 1) the employee was a member of a protected class; 2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; 3) the harassment complained of was based on sex; 4) the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employ-

1. Article 5221k was repealed. *See* section 1 of Acts 1993, 73rd Leg., ch. 269. The article was recodified in the Labor Code at section 21.051. This section became effective September 1, 1993. Labor Code section 21.051 applies only to a complaint filed with the Commission of Human Rights on or after September 1, 1993. A complaint filed before that date is governed by the law in effect on the date the complaint was filed, and the former law is continued in effect for that purpose. Act approved May 24, 1993, 73rd Leg., R.S., ch. 276 § 9, 1993 Tex.Sess.Law Serv. 1294 (Vernon).

Because Ewald filed her complaint before September 1, 1993, we look to article 5221k.

ee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of *respondeat superior* liability. *Id.*

■ In typical *quid pro quo* sexual harassment cases, supervisors rely upon their apparent or actual authority to extort sexual consideration from an employee. *Henson,* 682 F.2d at 910. In such cases, supervisors use the means available to them to accomplish the prohibited purpose—their actual or apparent authority to hire, fire, discipline or promote. *Id.* Because supervisors act within at least the apparent scope of the authority entrusted to them by the employer when they make employment decisions, their conduct can fairly be imputed to the source of authority, the company. *Id.* In a *quid pro quo* sexual harassment action, an employer is held strictly liable for the conduct of supervisory employees having plenary authority over hiring, advancement, dismissal, and discipline under the theory of *respondeat superior. Id.*

■ The second type of sexual harassment, hostile environment, includes the following elements: 1) the plaintiff belongs to a protected group, 2) the plaintiff was subject to unwelcome sexual harassment, 3) the harassment complained of was based upon sex, 4) the harassment complained of affected a "term, condition, or privilege" of employment, and 5) the employer knew or should of known of the harassment and failed to take remedial action. *Henson,* 682 F.2d at 909.

Ewald submitted the affidavit of Carmen Zapata as summary judgment evidence. By her affidavit, Zapata averred that *during her* employment she was familiar with Alonzo. She also averred to the following:

> For a period of time Oscar Alonzo was *employed as a supervisor for the company.* I can recall that his name and the title of "supervisor" appeared on the outside of his clothing. With regard to the employees that he supervised, I observed Mr. Alonzo directing and controlling their actions. I observed Mr. Alonzo discipline his employees, move people from one department to another and do other acts which [sic] to control the conditions of employment of his

> employees. One of the duties that I as a crew leader shared with Mr. Alonzo was to maintain a safe and a sexually nonhostile working environment.

■ By its motion for summary judgment, Wornick alleged that the same day Ewald reported the incident—a week after it occurred—Wornick terminated Alonzo's employment. Wornick contends that it could not have known about Alonzo's propensity for harassment. In addition, Wornick asserts that Ewald cannot prevail on a sexual harassment claim because it is undisputed that Alonzo had no authority to take any actions that would affect her employment status as he is not a supervisory employee. We disagree.

Indulging every reasonable inference in favor of the nonmovant, we conclude that material factual disputes exist. Regarding the *quid pro quo* claim, Ewald belongs to a protected group. Additionally, there is summary judgment evidence that she was the subject of unwelcome sexual harassment. The harassment about which Ewald complains was based upon sex. Additionally, Ewald's reaction to the harassment complained of affected tangible aspects of her terms, conditions, or privileges of her employment. Based upon Zapata's affidavit excerpted above, an issue of fact exists about whether Alonzo was in a position such that Ewald's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that Ewald's refusal to submit to Alonzo's sexual demands resulted in a tangible job detriment. Ewald's statement that Alonzo told her that if she complied with his desires he would see that she would get what she wanted—to get out of working in the freezer section. Additionally, the summary judgment evidence shows that Wornick acknowledged that it held a meeting with Alonzo in March 1990 during which he admitted his conduct to management personnel and received a warning about making inappropriate sexual comments to a female production employee.

Based upon the summary judgment evidence presented, we conclude that genuine issues of material fact exist regarding Wornick's liability for sexual harassment and the

trial court erred by granting summary judgment.

## Assault and Battery

■ Ewald asserts a cause of action for assault and battery against Wornick. Wornick alleges that it is not liable on Ewald's claim of assault and battery because her claim is based solely on the acts of Alonzo on November 1, 1990. Wornick contends that none of its acts or omissions that produced any alleged injury rose to the level of an intentional act. Therefore, Wornick asserts that it cannot be liable for any alleged assault and battery by Alonzo.

The fundamental difference between negligent injury, or even grossly negligent injury and an intentional injury is the specific intent to inflict injury. *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex.1985). This intent includes the actor's desire "to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 364–65 (Tex. App.—San Antonio 1992, writ denied).

To uphold the summary judgment regarding assault and battery, we must conclude that Wornick established as a matter of law that the company did not intend to inflict the injury or that it did not believe that the consequences were substantially certain.

Because evidence was presented that Wornick had knowledge of Alonzo's behavior problems and had previously warned him, we cannot find that, as a matter of law, Wornick did not believe the consequences of retaining Alonzo in its employment was substantially certain to lead to his sexual harassment of other women employees. We conclude that Wornick has not established its own prima facie case negating the elements of assault and battery. We reverse the summary judgment relating to assault and battery.

## Intentional Infliction of Emotional Distress

Ewald asserts by her petition that defendants' intentional and reckless actions were extreme and outrageous conduct, with the purpose of causing the infliction of severe emotional distress to Ewald. Ewald, by her petition, alleges that the defendants caused her both mental and physical pain. In addition to Ewald's claim for intentional infliction of emotional distress against Wornick based upon the alleged conduct of Alonzo, she claimed during her deposition that Wornick intentionally caused her emotional distress when it failed to put her on a different crew when she returned to work after Alonzo's termination. By her deposition, Ewald stated that some of the company employees began circulating a petition after she returned to work. This petition requested that Wornick bring Alonzo back to work and alleged that Ewald had lied and that Alonzo "was not that type of man." Ewald stated that this just humiliated her even more. She was still feeling harassed and Alonzo's employees were giving her dirty looks. Wornick alleges that Ewald did not state an independent cause of action for intentional infliction of emotional distress on the part of the company.

■ The elements of intentional infliction of emotional distress are: 1) the defendant acted intentionally or recklessly, 2) the defendant's conduct was extreme or outrageous, 3) the defendant's actions caused plaintiff emotional distress, and 4) the emotional distress was severe. *Benavides,* 848 S.W.2d at 195. Severity of distress is an element of the cause of action, not simply a matter of damages. *Benavides,* 848 S.W.2d at 195. The law intervenes only when the distress inflicted is so severe that no reasonable person could be expected to endure it. *Id.* Liability may be found "only where the conduct [complained of] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement 2d of Torts § 46 comment d (1965). The court determines whether the evidence produced establishes a fact question for the jury. *Natividad v. Alexsis Inc.,* 875 S.W.2d 695, 699 (1994); *Benavides,* 848 S.W.2d at 195. Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it may be tortious. *Natividad,* 875 S.W.2d at 699.

Summary judgment is proper if no fact issue exists about whether the conduct of

Wornick was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Ewald stated that after Alonzo was fired, she was no longer sexually harassed but that co-employees who had been friends with Alonzo were retaliating against her because she had gotten Alonzo fired. She complained that other employees stared at her and rumors were started about her. Ewald complained that she went to see Dr. Rodriguez, a psychiatrist in McAllen, four days before her deposition. She experienced headaches and an upset stomach.

While Ewald by her deposition asserts that other employees embarrassed her, this does not rise to the level of extreme such that actions of Wornick were beyond all possible bounds of decency. We conclude that Ewald has not stated a cause of action for intentional infliction of emotional distress on the part of Wornick. We sustain the portion of summary judgment relating to Ewald's claim of intentional infliction of emotional distress.

**Retaliatory Discharge**

Wornick alleged by its motion for summary judgment that Ewald did not state a cause of action for retaliatory discharge.

It is unlawful for an employer to retaliate or discriminate against a person who has opposed a discriminatory practice or who has made or filed a charge, filed a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act. Tex.Rev.Civ.Stat. Ann. art. 5221k, § 5.05(a)(1) (Vernon 1987).

It is undisputed that Ewald's discharge resulted from a violation of the company's Attendance and Punctuality Policy. Ewald, by her deposition, testified that she should have been discharged two weeks earlier for similar violations but that Perez gave her a break and excused her failure to call in or show up for work on three consecutive days in early December 1990. Ewald presents no summary judgment evidence that would raise an issue of fact regarding a claim for retaliatory discharge.

We find that none of the summary judgment evidence presented shows that Wornick terminated Ewald's employment because she had filed a complaint of sexual harassment. We find no evidence of any causal connection between her sexual harassment complaint and her discharge several weeks after her complaint. We sustain the portion of the summary judgment relating to retaliatory discharge.

**Damages**

Among the damages Ewald seeks are past and future lost earnings. Wornick sought a partial summary judgment regarding compensatory damages. By its summary judgment, Wornick contended that Ewald could not recover past or future compensatory damages beyond the closing date of the business, April 26, 1994.

Ewald asserts that there remains an issue of fact regarding damages beyond April 26, 1991, because some of Wornick's former employees are employed by Right Away Foods owned by Ronald Wornick. As summary judgment evidence Ewald presented the affidavits of Cynthia Garcia and Carmen Zapata each of whom stated that they were aware that some of Wornick's former employees were currently employed with Right Away Foods.

We conclude that evidence that some of Wornick's former employees currently work at Right Away Foods does not raise an issue of fact that Ewald could receive damages of lost wages beyond April 26, 1991, the date Wornick Family Foods ceased to exist. Any compensatory damages recoverable for lost past or future wages ended as of April 26, 1991.

We affirm the summary judgment regarding the causes of action for intentional infliction of emotional distress, and retaliatory discharge. Additionally, we hold that any damages for lost past and future wages should be limited to April 26, 1991. We reverse the summary judgment regarding sexual harassment and assault and battery asserted against Wornick and remand those

causes of action to the trial court for further proceedings.