IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 02-0120 

════════════

 

Hoffmann-La Roche Inc., a/k/a
ARoche,@ Petitioner

 

v.

 

Joan Zeltwanger, a/k/a Joan
Gonzales, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Thirteenth District
of Texas

════════════════════════════════════════════════════

 

 

Argued on February
5, 2003

 

 

 

Chief Justice Phillips delivered the
opinion of the Court in which Justice
Hecht, Justice Owen, Justice Jefferson, Justice Wainwright and Justice Brister joined.

 

Justice Hecht filed a concurring
opinion.

 

Justice O=Neill filed a concurring opinion in
which Justice Smith joined.

 

Justice Schneider did not participate
in the decision.

 

 

We
must decide whether a plaintiff can recover damages on a claim for intentional
infliction of emotional distress when the Legislature has created a statutory
right to seek emotional damages for the same actions that form the basis of the
intentional-infliction claim.  The court
of appeals concluded that the plaintiff could recover damages under both
claims, electing mental anguish and punitive damages under her
intentional-infliction claim while taking other compensatory damages and
attorney=s fees
under her sexual harassment claim.  69
S.W.3d 634.  We conclude that when the gravamen of the plaintiff=s
complaint is for sexual harassment, the plaintiff must proceed solely under a
statutory claim unless there are additional facts, unrelated to sexual
harassment, to support an independent tort claim for intentional infliction of
emotional distress.  We therefore reverse
the judgment of the court of appeals and remand the cause to the trial court
for rendition of judgment consistent with this opinion.

I

Joan
Zeltwanger[1] sued her
former employer, Hoffmann La-Roche, Inc. (ARoche@), for sexual harassment under Texas
Labor Code section 21.051, retaliation under Texas Labor Code section 21.055,
and intentional infliction of emotional distress.[2]  Zeltwanger also
sued Jim Webber, her supervisor at Roche, for intentional infliction of
emotional distress. 

Except
for the retaliation claim, Zeltwanger prevailed at
trial on all of her claims against Roche and Webber.  Against Webber, who is not a party to this
appeal, she obtained a judgment in the amount of $50,160 for intentional
infliction of emotional distress.  On her
sexual harassment claim against Roche, the jury awarded Zeltwanger
$835,963 for front and back pay, $500,000 in compensatory damages, and an
additional $8,000,000 in punitive damages. 
On the intentional infliction of emotional distress claim against Roche,
the jury awarded $1,000,000 for mental anguish, $73,000 for past and future
medical care, and another $8,000,000 in punitive damages.  Acknowledging potential double recovery and
applicable statutory cap[3]
considerations with respect to the $500,000 in compensatory and the $8,000,000
in punitive damages of the harassment award, Zeltwanger
moved to limit her harassment damages to front and back pay and attorney=s fees while taking her mental anguish
and punitive damages under her intentional-infliction claim.  The trial court therefore rendered judgment
awarding Zeltwanger $847,036 on her harassment claim,
comprising front and back pay adjusted for disability payments and
interest.  Judgment on the intentional
infliction of emotional distress claim against Roche, which at that time was
not subject to a statutory cap,[4] amounted
to $9,504,706, adjusted for interest. 
The court of appeals affirmed these awards, and Roche appeals only the
intentional infliction of emotional distress claim.

II

Zeltwanger began working in November 1990 as a sales
representative for Roche, a pharmaceutical company.  In this capacity, Zeltwanger
worked out of her home, as did other Roche sales representatives.  Roche, like many pharmaceutical sales
companies, did not maintain regional offices, instead running its nationwide
operations solely from its New Jersey corporate headquarters. 

Until
1992, Zeltwanger worked under Dallas-based sales
manager Betty Turicchi.  When Turicchi
became a Roche supervisor in another region, Webber, a Dallas-based division
sales manager, became Zeltwanger=s supervisor.  Zeltwanger testified
that Webber began telling dirty jokes in front of her in the last half of 1992,
three or four months after Zeltwanger moved into his
division, and went on to engage in other objectionable conduct. 

Zeltwanger discussed Webber=s
behavior with Turicchi on several occasions.  Turicchi, Zeltwanger says, gave her pointers on how to handle Webber
and Adocument
everything that was happening@  but warned her that making a claim of sexual
harassment within the company would jeopardize Zeltwanger=s chances of advancement.  Subsequently, Turicchi
advised Zeltwanger that she would need to contact
Roche human resources representative Betty DeVos in
order to make a formal complaint.

Zeltwanger eventually did contact DeVos,
and on August 19, 1994, she faxed a handwritten, five-page statement to her,
which made the following complaints about Webber:

 

1. Last fall at Div Mtgs with Zore - during Rocephin game.  I won
a question & he delivered my $5 between his teeth to me stating & you=ve implied
you=ve never been
to those top-less bars in front of 2 work groups.  Betty Turrichi
witnessed this at meeting.  Her division
or group was there also.

 

2. At Dir Mtg last fall - told dirty jokes & talked about
top-less dancers.  I told him I do not
like jokes like that & did not want to hear them.

 

3. Talked about his
car name was in college & that they used to have sex or Ado it@
in the car.

 

4. Last summer field
trip - continually tells dirty & inappropriate jokes - verbalized to me the
sorority girls Ahe
screwed@ in
college the couples they (him & his wife) still hang around & his goal
to Ado them@
all while standing at the trunk of my car. I responded with AI don=t
want to hear this.@

 

5. Had lunch last
Summer/Spring with my Arl. Memorial Hospital
Anesthesia & Jim made a comment to those physicians that I was not the
typical homely Betty Turicchi hire & he thought
it was a joke when I walked into Bennigans for a
confirming interview.  Their (the Drs.=) reply was - what is a typical Betty Turicchi hire? Jim=s
reply was they don=t have
legs & a body like that.  I was
standing outside of the room & heard this as I entered back into the room.

 

6. Told a Howard
Stern panty (underwear) story from a concert his daughter attended - ask me if
I was wearing panties.  This story was
told in one of my GI offices as I set up a teleconference last spring.

 

Despite my protest
he continued as follows:

 

7. Last winter while
on field trip Jim made inappropriate references to his body parts i.e. Ahis ding dong@
& how when he was in school he whipped it out in class.  I told him I did not want to hear it.

 

8. Last winter while
on field trip Jim made reference to my having a bad hair day & flung my
hair by touching it in front of one of my hospital pharmacists.  Before this call I was lectured about going
& Akicking
some ass@ with
this RPH & telling him what a liar he is for publishing a newsletter at
hospital.  He continually disregards my
credibility & work involved with the BID dosing problem at this
hospital.  To which the situation
attempts have been with in converting BID to QID dosing of Rocephin.

 

9. Last month on
field trips as on previous others he continually mentions & alludes to his
sexual encounters & sex positions (on his back) while screwing this girl
who lived in these apartments as we pass the apartments. I advised him at the
time I don=t want to
hear this.

 

10. Last Dec. when
Jim Webber came to my house to check samples I was in my office filling out a
form.  When I was finished I found him in
my bedroom.  When I ask him what he was
doing & to get out of my bedroom he said he was trying to find my stereo.

 

There
will be more to follow as I continue to compile a list.

On
August 24, 1994, Webber conducted a regularly-scheduled performance review of Zeltwanger, which Zeltwanger and Turrichi attended.  Zeltwanger testified that Webber Ascreamed
and yelled@ at her
and repeatedly criticized her job performance during this review.  Turicchi testified
that the discussion at the review focused on Zeltwanger=s job performance, particularly her
sales skills, and that Zeltwanger disagreed with
Webber=s
assessment of her performance.  In his
written evaluation based on the review, Webber gave Zeltwanger
an AH@
rating, a below average designation that signifies the employee is Ameeting most@
of the standards but needs to make improvements.  Shortly after this review, Roche completed
its investigation of Zeltwanger=s complaint and terminated Webber
because of his inappropriate behavior with Zeltwanger.


At
the end of 1994, Zeltwanger received notification
that  Roche had fired her also.  Shortly thereafter, she filed a complaint for
sexual harassment against Roche with the Texas Commission on Human Rights.  Under the section entitled ADiscrimination Statement,@ she stated:

 

I believe that I
have been discriminated against, in violation of the Texas Commission on Human
Rights Act, as amended, and Title VII of the Civil Rights Act of 1964, as
amended, because of my sex, female (sexual harassment), inasmuch as:

 

Background: Jim
Webber=s
reflections and references to his sexual exploits, and matters of a sexual
nature, became non-stop and always managed to get personal.  Some examples of this intolerable behavior
are:

 

- On a field trip in
early Winter 1993, Mr. Webber made inappropriate remarks about his body parts,
i.e., Ahis
ding-dong@ and
remarked that in school, in class, he used to Awhip
it out@.  On the same trip, Mr. Webber belittled me by
flinging my hair and referring to a Abad
hair day@ in front
of my hospital pharmacists.

 

- On a later trip,
in December 1993, Mr. Webber described sexual encounters and his preferred
position when Ascrewing
this girl who lives in those apartments@,
as we passed an apartment complex.

 

- Mr. Webber also
invaded my privacy by entering my bedroom when he came to my home to inspect
samples.

 

- In early 1994, at
several division meetings, Mr. Webber spoke of topless bars and told offensive,
obscene jokes.

 

- In Spring 1994,
Mr. Webber asked if I was wearing panties. 
This was also repeated to physicians in one of the offices while I set
up for a teleconference.

 

-
In spring/summer 1994, I overheard Mr. Webber telling physicians that I Awas not the typical homely hire@ and Athey
don=t have legs and a body like that!@

 

-
In mid summer 1994 on a field trip, Mr. Webber continually told lewd and smutty
jokes.  He mentioned the sorority girls Ahe screwed@
in college.  He also stated that his goal
was to Ado it@ while standing at the trunk of his
car.

 

A.
I repeatedly rebuffed Mr. Webber for his behavior but this only made matters
worse.  My work environment was
intolerable.

 

B.
Due to Mr. Webber=s
hostility and vindictiveness, I requested that a third impartial party be
present at my review in early August 1994. 
His behavior was unbearable and my review was unjustly negative.  I was forced to seek counseling.

 

C.
I am aware that an internal investigation of Mr. Webber=s
behavior found that the harassment allegations had Amerit.@

 

Zeltwanger=s complaints have remained largely
unchanged throughout this litigation, although at trial she added that she once
caught Webber going through her underwear drawer, not merely that he had
entered her bedroom without permission.  Zeltwanger explained at trial that she maintained a home
office and that it was standard procedure for her supervisor to come to her
home to take an inventory of her pharmaceutical samples.  During one such inventory, Webber wandered
into her bedroom and went through her underwear drawer.  Zeltwanger also
offered medical testimony at trial that she experienced symptoms of depression
and partial disability as a result of the alleged conduct.

III

To recover damages for
intentional infliction of emotional distress, a plaintiff must establish that:
(1) the defendant acted intentionally or recklessly; (2) the defendant=s conduct was extreme and outrageous;
(3) the defendant=s actions
caused the plaintiff emotional distress; and (4) the resulting emotional
distress was severe.  Standard Fruit
& Vegetable Co. v. Johnson, 985 S.W.2d 62, 65 (Tex. 1998).  Extreme and outrageous conduct is conduct A>so
outrageous in character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in
a civilized community.=@ 
Twyman v. Twyman,
855 S.W.2d 619, 621 (Tex. 1993) (quoting Restatement
(Second) of Torts '
46 cmt. d (1965)). 
Liability does not extend to mere insults, indignities, threats,
annoyances, petty oppressions, or other trivialities.  GTE Southwest, Inc. v. Bruce, 998 S.W.2d
605, 612 (Tex. 1999); Restatement
(Second) of Torts '
46 cmt.  d
(1965).  It is for the court to
determine, in the first instance, whether a defendant=s
conduct was extreme and outrageous.  GTE
Southwest, Inc., 998 S.W.2d at 616; Restatement
(Second) of Torts '
46 cmt. h.  But
when reasonable minds may differ, it is for the jury, subject to the court=s control, to determine whether, in the
particular case, the conduct was sufficiently extreme and outrageous to result
in liability.  GTE Southwest, Inc.,
998 S.W.2d at 616; Restatement (Second)
of Torts ' 46 cmt. h. 

In addition to her common-law
claim for intentional infliction of emotional distress, Zeltwanger
sought damages for Roche=s
violation of the Texas Commission on Human Rights Act (CHRA).  This statute prohibits an employer from
discriminating against an individual because of race, color, disability,
religion, sex, national origin or age.  See
Tex. Lab. Code ' 21.051.  Sexual harassment[5] is one
form of prohibited employment discrimination. 
See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986); Ewald v. Wornick Family
Foods, Corp., 878 S.W.2d 653, 658 (Tex. App.-Corpus Christi 1994, writ
denied). 

The CHRA Ais modeled after federal law with the
purpose of executing the policies set forth in Title VII of the federal Civil
Rights Act of 1964.@  Green v. Indus. Specialty Contractors, Inc.,
1 S.W.3d 126, 131 (Tex. App.BHouston
[1st Dist.] 1999, no pet.); see also Tex.
Lab. Code ' 21.001;
42 U.S.C. ' 2000e-2
(Civil Rights Act of 1964).  As such,
federal case law may be cited as authority in cases relating to the Texas
Act.  Stinnett v. Williamson County
Sheriff's Dep't, 858 S.W.2d 573, 576 (Tex. App.BAustin
1993, writ denied).  The CHRA further
establishes a Acomprehensive
administrative review system,@
under which the Aexhaustion
of administrative remedies is a mandatory prerequisite to filing a civil action
alleging violations of the CHRA.@  Schroeder v. Tex. Iron Works, Inc.,
813 S.W.2d 483, 485, 488 (Tex. 1991).

In creating causes of action
for discrimination, including sexual harassment, both Congress and the Texas
Legislature have specified the types and amounts of damages that may be
awarded.  See 42 U.S.C. ' 1981a(b)(3); Tex.  Lab.  Code '
21.2585.  The CHRA provides that a court
may award compensatory damages upon finding that an employer has engaged in an
unlawful intentional employment practice and may further award punitive damages
when the discriminatory practice is with malice or reckless indifference.  Tex.  Lab. Code '
21.2585(a), (b).  The Texas Act further
caps the award of punitive and compensatory damages on a sliding scale
commensurate with the size of the employer. 
Id. '
21.2585(d).  The largest employers, like
Roche, are subject to a maximum cap of $300,000.  Id. '
21.2585(d)(4).  The compensatory damages
which are capped specifically include, among other things, Aemotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.@  Id. '
21.2585(d).  The cap does not apply to
back pay, interest on back pay, and equitable relief.  Id. '
21.2585(c).

As previously set out, the jury
awarded Zeltwanger approximately $8.5 million in
damages for mental anguish and punitive damages under her sexual harassment
claim and about $9 million for mental anguish and punitive damages under her
intentional-infliction claim.   Because
of the duplication in these awards, the trial court allowed Zeltwanger
to take her mental anguish and punitive damages under the
intentional-infliction claim, collecting only her front and back pay damages
under the statutory claim.  Zeltwanger=s
choice was understandable, as her statutory recovery for these damages was capped
at $300,000, while her common-law damages were then uncapped.  Thus, by electing to take part of her damages
under her common law tort claim, Zeltwanger avoided
the effect of the statutory cap.

IV

Roche complains that Zeltwanger has improperly used the intentional-infliction
tort to circumvent the legal limitations 
on the amount of mental anguish and punitive damages recoverable in a
sexual harassment suit.  Roche submits that
the intentional-infliction tort is a Agap-filler@ that only applies under special
circumstances when more established torts do not permit recovery.  Because the CHRA provided a statutory remedy
for essentially the same conduct, Roche submits there was no gap to be filled
by the common law and hence no right to an award of further damages against
it.  Alternatively, Roche contends that
if the tort of intentional infliction applies here, the evidence is legally
insufficient to satisfy one or more of its elements.

Zeltwanger
responds that her intentional infliction and sexual harassment claims were not
based entirely upon the same conduct or the same facts.  While the actions of Roche through Webber did
include extreme and outrageous sexual harassment, Zeltwanger
submits that they also included public humiliation, intimidating verbal abuse,
threatening gestures, and invasions of Zeltwanger=s privacy in her own home.  Furthermore, Zeltwanger
contends that Roche=s Agap-filler@
argument is an appellate afterthought that was neither raised nor preserved in
the trial court.  Finally, Zeltwanger concludes that the evidence fully supports the
jury=s finding
that Roche intentionally or recklessly caused her severe emotional distress
through extreme and outrageous conduct.

A

Roche=s
gap-filler argument is based on our decision in Standard Fruit and Vegetable
Co. v. Johnson, 985 S.W.2d 62, 68 (Tex. 1998).  There we recognized that the intentional
infliction of emotional distress was, first and foremost, a Agap-filler@
tort, judicially created for the limited purpose of allowing recovery in those
rare instances in which a defendant intentionally inflicts severe emotional
distress in a manner so unusual that the victim has no other recognized theory
of redress.  Id.  The tort=s
Aclear purpose,@
we noted, was Ato
supplement existing forms of recovery by providing a cause of action for
egregious conduct@ that
might otherwise go unremedied.  Id. 
We cautioned, however, that the tort was Aa
>gap-filler=
tort that should not be extended to circumvent the limitations placed on the
recovery of mental anguish damages under more established tort doctrines.@  Id. 


Likewise, in this case, the
tort should not be extended to thwart legislative limitations on statutory
claims for mental anguish and punitive damages. 
By combining her sexual harassment claim with the intentional-infliction
tort, Zeltwanger has circumvented, by more than
thirty-fold, the legislative determination of the maximum amount that a
defendant should pay for this type of conduct. 
In creating the new tort, we never intended that it be used to evade
legislatively-imposed limitations on statutory claims or to supplant existing
common law remedies.  Properly cabined,
the tort simply has no application when the Aactor
>intends to invade some other legally
protected interest,= even if
emotional distress results.@  Id. at 67 (quoting Restatement (Second) of Torts ' 47 cmt. a
(1965)); accord Messick v. Toyota
Motor Mfg., Ky, Inc., 45 F. Supp. 2d 578, 582
(E.D. Ky. 1999) (no claim for intentional infliction of emotional distress
because plaintiff had an existing form of recovery for emotional distress under
civil rights statute); K.G. v. R.T.R., 918 S.W.2d 795, 799 (Mo. 1996)
(intentional infliction of emotional distress claims Awill
not lie where the alleged conduct is intended to invade other legally protected
interests of the plaintiff@);
McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc. 682 N.Y.S.2d
167, 169 (N.Y. App. Div. 1998) (no reason to apply tort of intentional
infliction of emotional distress where an applicable statute expressly provides
for emotional distress damages); Haubry v. Snow,
31 P.3d 1186, 1193 (Wash. Ct. App. 2001) (Aemployee
may recover damages of emotional distress . . . but only if the factual basis
for the claim is distinct from the factual basis for the discrimination claim@). 
Where the gravamen of a plaintiff=s complaint is really another tort,
intentional infliction of emotional distress should not be available.  See, e.g., Provencher
v. CVS Pharmacy, 145 F.3d 5, 12 (1st Cir. 1998) (defamation); Thompson
v. Sweet, 194 F. Supp. 2d 97, 103 (N.D.N.Y. 2002) (malicious prosecution,
false imprisonment); Norris v. Bangor Publ=g Co., 53 F. Supp. 2d 495, 508-09
(D. Me. 1999) (defamation); Barker v. Huang, 610 A.2d 1341, 1351 (Del.
1992) (defamation); Banks v. Fritsch, 39 S.W.3d 474, 481 (Ky. Ct. App.
2001) (false imprisonment and assault and battery); Nazeri
v. Mo. Valley Coll., 860 S.W.2d 303, 316 (Mo. 1993) (defamation); Quaker
Petroleum Chems. Co. v. Waldrop, 75 S.W.3d 549,
555 (Tex. App.BSan
Antonio 2002, no pet.) (negligence, gross negligence); Rice v. Janovich, 742 P.2d 1230, 1238 (Wash. 1987)
(assault).  Thus, we need not decide
whether, in the absence of a legislative remedy for sexual harassment, the
evidence here would be sufficient to support a claim for intentional infliction
of emotional distress.

In her concurring opinion, Justice O=Neill expresses concern that our
gap-filler analysis may lead to unintended consequences such as a larger
monetary recovery in tort for plaintiffs who cannot sustain their burden for
sexual harassment.  She asks: ADoes the fact that the plaintiff did
not sustain its evidentiary burden on an alternative claim create a gap that
intentional-infliction was designed to fill?@  She further worries that our analysis may
lead to skewed trials in which defendants find it advantageous to confess
liability for sexual harassment to avoid more onerous awards under the
intentional-infliction tort.  In answer
to these concerns, we note that a plaintiff=s
failure to establish his or her claim for sexual harassment does not mean that
the plaintiff has a claim for intentional infliction of emotional
distress.  If the gravamen
of a plaintiff=s
complaint is the type of wrong that the statutory remedy was meant to cover, a
plaintiff cannot maintain an intentional infliction claim regardless of whether
he or she succeeds on, or even makes, a statutory claim. 

B

Zeltwanger
contends, however, that she can elect the higher recovery here because
independent grounds, apart from sexual harassment, exist for the tort.  She argues that there is evidence of
additional egregious, but wholly non-sexual, conduct in this case involving
public humiliation, verbal oppression, physical threats, invasion of privacy,
abuse of power, and mistreatment of an employee known to have been rendered
susceptible to emotional distress.  

Roche responds that throughout
this case Zeltwanger has consistently treated Webber=s behavior as a cohesive set of actions
that support both her sexual harassment and intentional-infliction claims.  None of her mental anguish evidence at trial
was separated into one claim or the other, and Roche submits that any such
designation would have been artificial in any event.  Sexual harassment, Roche points out, often
devolves into other forms of abuse and bullying.

While the court of appeals did
not differentiate between sexual and non-sexual conduct, it did find the
following acts by Roche, taken together, sufficient to constitute extreme and
outrageous conduct: (1) Roche Aallowed@ the development of a corporate culture
that permitted vulgar joke-telling; (2) Turicchi
failed initially to report to upper management Zeltwanger=s discussions with her about Webber=s conduct; (3) Roche subjected Zeltwanger to the August 1994 in-person review with Webber
after she had formally complained about Webber=s
conduct and sent Turicchi only as an observer without
authority to intervene when Webber verbally abused Zeltwanger
during this session; (4) Roche terminated Zeltwanger
and caused her to believe this termination was, in part, based on Webber=s unfavorable evaluation of her at the
August 1994 review; and (5) Roche allowed managers like Webber to function
unsupervised in the field (including in cars and homes) with direct
responsibility for female employees like Zeltwanger.  69 S.W.3d at 646-47.  Even assuming that some or all of this
conduct might be considered to be independent of Zeltwanger=s sexual harassment claim, an assertion
of which we are skeptical but need not decide, it does not rise to the level of
extreme or outrageous conduct.

First, Zeltwanger=s proof that Roche allowed a corporate
culture of insensitive jokes relating to women and minorities falls short of
constituting extreme and outrageous conduct. 
Zeltwanger=s
evidence showed only a handful of instances of off-color jokes being told among
Roche employees over a period of several years in a company with 1,000 sales
people.  Such evidence is legally
insufficient to show that Roche fostered a culture that encouraged extreme and
outrageous conduct.

Second, we conclude that Turicchi=s
failure to report Zeltwanger=s
concerns about Webber to others within Roche was not extreme and
outrageous.  Zeltwanger
does not claim that she attempted to file a formal complaint with Turicchi.  Moreover,
after Zeltwanger talked with Turicchi
on several occasions about Webber=s
conduct, Turicchi told her about DeVos,
the appropriate person with whom to file a formal complaint.  Finally, 
Turicchi did not exercise authority over
either Zeltwanger or Webber.  In sum, Turicchi=s failure to take more aggressive
action in response to Zeltwanger=s concerns about Webber is no evidence
of extreme and outrageous conduct on the part of Roche.

Third, Zeltwanger=s claim that Roche=s conduct surrounding  her August 1994 performance review with
Webber was extreme and outrageous is without merit.  Zeltwanger asserts
that Roche itself caused her distress by telling Webber in advance that Turicchi would attend her review and by scheduling the
review at Webber=s
home.  Her complaint is not that Turicchi was present, but that Webber had several days to
prepare for the review knowing that Zeltwanger would
not be alone.  We do not believe that
such notice to a supervisor is in any way extreme or outrageous.  Nor is the location of the review given the
circumstance that Roche did not have physical offices in Texas.  Zeltwanger does not
assert that she felt physically imperiled by the prospect of going to Webber=s home, especially with Turrichi present. 

Fourth, Zeltwanger=s charge that Roche led her to believe
that Webber=s
performance evaluation of her after this review session was a factor in her
termination is not extreme or outrageous. 
We have held that workplace and employment matters such as Acriticism, lack of recognition, and low
evaluations@ are not
actionable, even if they are unpleasant or unfair.  GTE Southwest, Inc., 998 S.W.2d at
613.  Nothing in this record indicates that
Roche did anything more than make an honest error in telling her that the
review would be a factor in whether she was retained or terminated.

Finally, Zeltwanger=s claim that allowing managers to
function unsupervised in the field (including in cars and homes) with direct
responsibility for female employees is not extreme or outrageous.  While it may well have been easier for Webber
to engage in his objectionable conduct because he and Zeltwanger
worked in the field rather than at a traditional business office, there is no
evidence this management structure amounts to a corporate policy endorsing
Webber=s
conduct.  Thus, even assuming there is
evidence of conduct by Roche which may be considered to be independent of the
sexual harassment claim, we conclude that such conduct is not extreme or
outrageous as a matter of law.

C

Zeltwanger
finally argues that Roche failed to raise its Agap-filler@ argument in the trial court and thus
has waived the award of damages under the intentional-infliction claim.  She submits that Roche did not plead or
assert by special exception that this tort was per se unavailable in any case
involving statutorily-actionable sexual harassment nor did it object to the
jury charge on this basis.  But Roche did
complain in its motion for judgment non obstante veredicto that intentional infliction was a gap-filler tort
that could not be extended to circumvent the limitations placed on the recovery
of mental anguish damages.  In this
motion, Roche specifically urged the limitations set out in Standard Fruit
and Vegetable Co. v. Johnson:

 

[T]he
Supreme Court=s opinion
in Johnson explains that the tort=s
clear purpose is to supplement existing forms of recovery by providing a cause
of action for particularly egregious conduct that its more established neighbors
in tort doctrine would technically fence out. 
In short, intentional infliction of emotional distress is a Agap-filler@
tort that cannot be extended to circumvent the limitations placed on the
recovery of mental anguish damages under more established tort doctrine.

 

(citations
omitted).  Because the issue presented a
pure legal question which did not affect the jury=s
role as fact finder, the post-verdict motion was sufficient to preserve
error.  See Holland v. Wal-Mart
Stores, Inc., 1 S.W.3d 91, 94 (Tex. 
1999) (Ano
logical reason to treat a post-verdict legal availability challenge differently
than a post-verdict legal sufficiency challenge@).

 

* * *

 

In sum, we do not believe that Zeltwanger=s
intentional-infliction claim is independent of her sexual harassment
claim.  Because the CHRA provides a
remedy for the same emotional damages caused by essentially the same actions,
there is no remedial gap in this case and thus no support for the award of
damages under the intentional-infliction claim. 
Moreover, even were we to consider only that conduct that might arguably
form an independent basis for such a claim and indulge every reasonable
inference and intendment in favor of such claim, it would still not be
sufficient to raise a fact issue. 
Accordingly, the court of appeals erred in affirming that part of the
trial court=s
judgment awarding damages under the tort theory.  We reverse that judgment and remand the cause
to the trial court for it to render judgment for the appropriate damages under Zeltwanger=s
sexual harassment claim.

 

 

____________________________________

Thomas
R. Phillips

Chief
Justice

 

 

Opinion
delivered:      August 27, 2004

 











[1] After filing this lawsuit, Zeltwanger married and changed her name to Gonzales but
apparently did not ask that the style of the case be changed.





[2] These provisions of the Labor Code
were enacted as part of the Texas Commission on Human Rights Act.  See Act of June 25, 1983, 68th Leg.,
1st C.S., ch.7, '' 
1.01 - 10.07, 1983 Tex. Gen. Laws 37-58 (current version at Tex. Lab. Code '' 
21.001 - .306).





[3] In suits against corporations such as
Roche that have more than 500 employees, section 21.2585 of the Texas Labor
Code caps at $300,000 the sum of the amount of compensatory damages that may be
awarded for future pecuniary losses, emotional pain, suffering, inconvenience,
mental anguish, loss of enjoyment of life, and other nonpecuniary
losses, as well as the amount of punitive damages awarded. 





[4] Texas Civil Practice and Remedies
Code section 41.008, which provides a limit on certain punitive damage awards,
applies only to actions accruing on or after September 1, 1995.  See Act of April 20, 1995, 74th R.S., ch. 19, ' 2, 1995 Tex. Gen. Laws 108, 113.





[5] Sexual harassment claims generally
take either of two forms:  (1) quid pro
quo harassment, in which employment benefits are conditioned on sexual favors;
and (2) harassment that creates a hostile or offensive work environment.   Syndex Corp. v. Dean, 820 S.W.2d 869, 871 (Tex. App.BAustin
1991, writ denied).